# GONZAGA UNIVERSITY ET AL. v. DOE

No. 01–679.   Argued April 24, 2002—Decided June 20, 2002

274

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CONNOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. BREYER, J., filed an opinion concurring in the judgment, in which SOUTER, J., joined, *post*, p. 291. STEVENS, J., filed a dissenting opinion, in which GINSBURG, J., joined, *post*, p. 293.

*John G. Roberts, Jr.,* argued the cause for petitioners. With him on the briefs were *Martin Michaelson, Charles K. Wiggins,* and *Kenneth W. Masters.*

*Patricia A. Millett* argued the cause for the United States as *amicus curiae* urging reversal. With her on the brief were *Solicitor General Olson, Assistant Attorney General McCallum, Deputy Solicitor General Kneedler, Mark B. Stern, Alisa B. Klein,* and *Anne Murphy.*

*Beth S. Brinkmann* argued the cause for respondent. With her on the brief were *Drew S. Days III* and *Lois K. Perrin.**

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

The question presented is whether a student may sue a private university for damages under Rev. Stat. § 1979, 42 U. S. C. § 1983 (1994 ed., Supp. V), to enforce provisions of the Family Educational Rights and Privacy Act of 1974 (FERPA or Act), 88 Stat. 571, 20 U. S. C. § 1232g, which prohibit the federal funding of educational institutions that have a policy or practice of releasing education records to unauthorized persons. We hold such an action foreclosed because the relevant provisions of FERPA create no personal rights to enforce under 42 U. S. C. § 1983 (1994 ed., Supp. V).

---

*Briefs of *amici curiae* urging reversal were filed for the State of Illinois et al. by *James E. Ryan,* Attorney General of Illinois, *Joel D. Bertocchi,* Solicitor General, *Michael P. Doyle,* Assistant Attorney General, and *Dan Schweitzer,* and by the Attorneys General for their respective States as follows: *Bill Pryor* of Alabama, *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *Earl I. Anzai* of Hawaii, *J. Joseph Curran, Jr.,* of Maryland, *Mike Moore* of Mississippi, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *David Samson* of New Jersey, *Betty D. Montgomery* of Ohio, *Hardy Myers* of Oregon, *Mark L. Shurtleff* of Utah, *Christine O. Gregoire* of Washington, and *Hoke MacMillan* of Wyoming; for the American Association of Community Colleges et al. by *Philip Burling, John M. Stevens,* and *Sheldon E. Steinbach;* and for the Reporters Committee for Freedom of the Press et al. by *Gregg P. Leslie, Lucy A. Dalglish, Bruce W. Sanford,* and *S. Mark Goodman.*

*Aaron H. Caplan, Jordan Gross,* and *Steven R. Shapiro* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

Respondent John Doe is a former undergraduate in the School of Education at Gonzaga University, a private university in Spokane, Washington. He planned to graduate and teach at a Washington public elementary school. Washington at the time required all of its new teachers to obtain an affidavit of good moral character from a dean of their graduating college or university. In October 1993, Roberta League, Gonzaga's "teacher certification specialist," overheard one student tell another that respondent engaged in acts of sexual misconduct against Jane Doe, a female undergraduate. League launched an investigation and contacted the state agency responsible for teacher certification, identifying respondent by name and discussing the allegations against him. Respondent did not learn of the investigation, or that information about him had been disclosed, until March 1994, when he was told by League and others that he would not receive the affidavit required for certification as a Washington schoolteacher.

Respondent then sued Gonzaga and League (petitioners) in state court. He alleged violations of Washington tort and contract law, as well as a pendent violation of § 1983 for the release of personal information to an "unauthorized person" in violation of FERPA.[1] A jury found for respondent on all counts, awarding him $1,155,000, including $150,000 in compensatory damages and $300,000 in punitive damages on the FERPA claim.

---

[1] The Washington Court of Appeals and the Washington Supreme Court found petitioners to have acted "under color of state law" for purposes of § 1983 when they disclosed respondent's personal information to state officials in connection with state-law teacher certification requirements. 143 Wash. 2d 687, 710–711, 24 P. 3d 390, 401–402 (2001). Although the petition for certiorari challenged this holding, we agreed to review only the question posed in the first paragraph of this opinion, a question reserved in *Owasso Independent School Dist. No. I–011* v. *Falvo,* 534 U. S. 426, 430–431 (2002). We therefore assume without deciding that the relevant disclosures occurred under color of state law.

The Washington Court of Appeals reversed in relevant part, concluding that FERPA does not create individual rights and thus cannot be enforced under § 1983. 99 Wash. App. 338, 992 P. 2d 545 (2000). The Washington Supreme Court reversed that decision, and ordered the FERPA damages reinstated. 143 Wash. 2d 687, 24 P. 3d 390 (2001). The court acknowledged that "FERPA itself does not give rise to a private cause of action," but reasoned that FERPA's nondisclosure provision "gives rise to a federal right enforceable under section 1983." *Id.*, at 707–708, 24 P. 3d, at 400.

Like the Washington Supreme Court and the State Court of Appeals below, other state and federal courts have divided on the question of FERPA's enforceability under § 1983.[2] The fact that all of these courts have relied on the same set of opinions from this Court suggests that our opinions in this area may not be models of clarity. We therefore granted certiorari, 534 U. S. 1103 (2002), to resolve the conflict among the lower courts and in the process resolve any ambiguity in our own opinions.

Congress enacted FERPA under its spending power to condition the receipt of federal funds on certain requirements relating to the access and disclosure of student educational records. The Act directs the Secretary of Education to withhold federal funds from any public or private "educational agency or institution" that fails to comply with these conditions. As relevant here, the Act provides:

---

[2] Compare *Gundlach* v. *Reinstein*, 924 F. Supp. 684, 692 (ED Pa. 1996) (FERPA confers no enforceable rights because it contains "no unambiguous intention on the part of the Congress to permit the invocation of § 1983 to redress an individual release of records"), aff'd, 114 F. 3d 1172 (CA3 1997); and *Meury* v. *Eagle-Union Community School Corp.*, 714 N. E. 2d 233, 239 (Ind. Ct. App. 1999) (same), with *Falvo* v. *Owasso Independent School Dist. No. I-011*, 233 F. 3d 1203, 1210 (CA10 2000) (concluding that release of records in "violation of FERPA is actionable under . . . § 1983"), rev'd on other grounds, 534 U. S. 426 (2002); and *Brown* v. *Oneonta*, 106 F. 3d 1125, 1131–1132 (CA2 1997) (same).

"No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein . . .) of students without the written consent of their parents to any individual, agency, or organization." 20 U. S. C. § 1232g(b)(1).

The Act directs the Secretary of Education to enforce this and other of the Act's spending conditions. § 1232g(f). The Secretary is required to establish an office and review board within the Department of Education for "investigating, processing, reviewing, and adjudicating violations of [the Act]." § 1232g(g). Funds may be terminated only if the Secretary determines that a recipient institution "is failing to comply substantially with any requirement of [the Act]" and that such compliance "cannot be secured by voluntary means." §§ 1234c(a), 1232g(f).

Respondent contends that this statutory regime confers upon any student enrolled at a covered school or institution a federal right, enforceable in suits for damages under § 1983, not to have "education records" disclosed to unauthorized persons without the student's express written consent. But we have never before held, and decline to do so here, that spending legislation drafted in terms resembling those of FERPA can confer enforceable rights.

In *Maine* v. *Thiboutot*, 448 U. S. 1 (1980), six years after Congress enacted FERPA, we recognized for the first time that § 1983 actions may be brought against state actors to enforce rights created by federal statutes as well as by the Constitution. There we held that plaintiffs could recover payments wrongfully withheld by a state agency in violation of the Social Security Act. *Id.*, at 4. A year later, in *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1 (1981), we rejected a claim that the Developmentally Disabled Assistance and Bill of Rights Act of 1975 conferred enforceable rights, saying:

> "In legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." *Id.*, at 28.

We made clear that unless Congress "speak[s] with a clear voice," and manifests an "unambiguous" intent to confer individual rights, federal funding provisions provide no basis for private enforcement by § 1983. *Id.*, at 17, 28, and n. 21.

Since *Pennhurst*, only twice have we found spending legislation to give rise to enforceable rights. In *Wright* v. *Roanoke Redevelopment and Housing Authority*, 479 U. S. 418 (1987), we allowed a § 1983 suit by tenants to recover past overcharges under a rent-ceiling provision of the Public Housing Act, on the ground that the provision unambiguously conferred "a mandatory [benefit] focusing on the individual family and its income." *Id.*, at 430. The key to our inquiry was that Congress spoke in terms that "could not be clearer," *ibid.*, and conferred entitlements "sufficiently specific and definite to qualify as enforceable rights under *Pennhurst*." *Id.*, at 432. Also significant was that the federal agency charged with administering the Public Housing Act "ha[d] never provided a procedure by which tenants could complain to it about the alleged failures [of state welfare agencies] to abide by [the Act's rent-ceiling provision]." *Id.*, at 426.

Three years later, in *Wilder* v. *Virginia Hospital Assn.*, 496 U. S. 498 (1990), we allowed a § 1983 suit brought by health care providers to enforce a reimbursement provision of the Medicaid Act, on the ground that the provision, much like the rent-ceiling provision in *Wright*, explicitly conferred specific monetary entitlements upon the plaintiffs. Congress left no doubt of its intent for private enforcement, we said, because the provision required States to pay an "objective" monetary entitlement to individual health care providers, with no sufficient administrative means of enforcing the

requirement against States that failed to comply. 496 U. S., at 522–523.

Our more recent decisions, however, have rejected attempts to infer enforceable rights from Spending Clause statutes. In *Suter* v. *Artist M.*, 503 U. S. 347 (1992), the Adoption Assistance and Child Welfare Act of 1980 required States receiving funds for adoption assistance to have a "plan" to make "reasonable efforts" to keep children out of foster homes. A class of parents and children sought to enforce this requirement against state officials under § 1983, claiming that no such efforts had been made. We read the Act "in the light shed by *Pennhurst*," *id.*, at 358, and found no basis for the suit, saying:

> "Careful examination of the language . . . does not unambiguously confer an enforceable right upon the Act's beneficiaries. The term 'reasonable efforts' in this context is at least as plausibly read to impose only a rather generalized duty on the State, to be enforced not by private individuals, but by the Secretary in the manner [of reducing or eliminating payments]." *Id.*, at 363.

Since the Act conferred no specific, individually enforceable rights, there was no basis for private enforcement, even by a class of the statute's principal beneficiaries. *Id.*, at 357.

Similarly, in *Blessing* v. *Freestone*, 520 U. S. 329 (1997), Title IV–D of the Social Security Act required States receiving federal child-welfare funds to "substantially comply" with requirements designed to ensure timely payment of child support. Five Arizona mothers invoked § 1983 against state officials on grounds that state child-welfare agencies consistently failed to meet these requirements. We found no basis for the suit, saying:

> "Far from creating an *individual* entitlement to services, the standard is simply a yardstick for the Secretary to measure the *systemwide* performance of a State's Title IV–D program. Thus, the Secretary must look to

the aggregate services provided by the State, not to whether the needs of any particular person have been satisfied." *Id.*, at 343 (emphases in original).

Because the provision focused on "the aggregate services provided by the State," rather than "the needs of any particular person," it conferred no individual rights and thus could not be enforced by § 1983. We emphasized: "[T]o seek redress through § 1983, . . . a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*." *Id.*, at 340 (emphases in original).

Respondent reads this line of cases to establish a relatively loose standard for finding rights enforceable by § 1983. He claims that a federal statute confers such rights so long as Congress intended that the statute "benefit" putative plaintiffs. Brief for Respondent 40–46. He further contends that a more "rigorous" inquiry would conflate the standard for inferring a private right of action under § 1983 with the standard for inferring a private right of action directly from the statute itself, which he admits would not exist under FERPA. *Id.*, at 41–43. As authority, respondent points to *Blessing* and *Wilder*, which, he says, used the term "benefit" to define the sort of statutory interest enforceable by § 1983. See *Blessing, supra,* at 340–341 ("Congress must have intended that the provision in question benefit the plaintiff"); *Wilder, supra,* at 509 (same).

Some language in our opinions might be read to suggest that something less than an unambiguously conferred right is enforceable by § 1983. *Blessing,* for example, set forth three "factors" to guide judicial inquiry into whether or not a statute confers a right: "Congress must have intended that the provision in question benefit the plaintiff," "the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence," and "the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms." 520 U. S., at 340–341. In

the same paragraph, however, *Blessing* emphasizes that it is only violations of *rights,* not *laws,* which give rise to § 1983 actions. *Id.,* at 340. This confusion has led some courts to interpret *Blessing* as allowing plaintiffs to enforce a statute under § 1983 so long as the plaintiff falls within the general zone of interest that the statute is intended to protect; something less than what is required for a statute to create rights enforceable directly from the statute itself under an implied private right of action. Fueling this uncertainty is the notion that our implied private right of action cases have no bearing on the standards for discerning whether a statute creates rights enforceable by § 1983. *Wilder* appears to support this notion, 496 U. S., at 508–509, n. 9, while *Suter,* 503 U. S., at 363–364, and *Pennhurst,* 451 U. S., at 28, n. 21, appear to disavow it.

We now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983. Section 1983 provides a remedy only for the deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the United States. Accordingly, it is *rights,* not the broader or vaguer "benefits" or "interests," that may be enforced under the authority of that section. This being so, we further reject the notion that our implied right of action cases are separate and distinct from our § 1983 cases. To the contrary, our implied right of action cases should guide the determination of whether a statute confers rights enforceable under § 1983.

We have recognized that whether a statutory violation may be enforced through § 1983 "is a different inquiry than that involved in determining whether a private right of action can be implied from a particular statute." *Wilder, supra,* at 508, n. 9. But the inquiries overlap in one meaningful respect—in either case we must first determine whether Congress *intended to create a federal right.* Thus we have held that "[t]he question whether Congress . . . intended to create a private right of action [is] definitively an-

swered in the negative" where a "statute by its terms grants no private rights to any identifiable class." *Touche Ross & Co.* v. *Redington,* 442 U. S. 560, 576 (1979). For a statute to create such private rights, its text must be "phrased in terms of the persons benefited." *Cannon* v. *University of Chicago,* 441 U. S. 677, 692, n. 13 (1979). We have recognized, for example, that Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972 create individual rights because those statutes are phrased "with an *unmistakable focus* on the benefited class." *Id.,* at 691 (emphasis added).[3] But even where a statute is phrased in such explicit rights-creating terms, a plaintiff suing under an implied right of action still must show that the statute manifests an intent "to create not just a private *right* but also a private *remedy.*" *Alexander* v. *Sandoval,* 532 U. S. 275, 286 (2001) (emphases added).

Plaintiffs suing under § 1983 do not have the burden of showing an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes. See *supra,* at 279–281. Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983.[4] But

---

[3] Title VI provides: "*No person* in the United States *shall* . . . be subjected to discrimination under any program or activity receiving Federal financial assistance" on the basis of race, color, or national origin. 78 Stat. 252, 42 U. S. C. § 2000d (1994 ed.) (emphasis added). Title IX provides: "*No person* in the United States *shall,* on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance." 86 Stat. 373, 20 U. S. C. § 1681(a) (emphasis added). Where a statute does not include this sort of explicit "right- or duty-creating language," we rarely impute to Congress an intent to create a private right of action. See *Cannon,* 441 U. S., at 690, n. 13 (listing provisions); *Alexander* v. *Sandoval,* 532 U. S. 275, 288 (2001) (existence or absence of rights-creating language is critical to the Court's inquiry).

[4] The State may rebut this presumption by showing that Congress "specifically foreclosed a remedy under § 1983." *Smith* v. *Robinson,* 468 U. S. 992, 1004–1005, n. 9 (1984). The State's burden is to demonstrate that Congress shut the door to private enforcement either expressly, through

the initial inquiry—determining whether a statute confers any right at all—is no different from the initial inquiry in an implied right of action case, the express purpose of which is to determine whether or not a statute "confer[s] rights on a particular class of persons." *California* v. *Sierra Club*, 451 U. S. 287, 294 (1981). This makes obvious sense, since § 1983 merely provides a mechanism for enforcing individual rights "secured" elsewhere, *i. e.*, rights independently "secured by the Constitution and laws" of the United States. "[O]ne cannot go into court and claim a 'violation of § 1983'—for § 1983 by itself does not protect anyone against anything." *Chapman* v. *Houston Welfare Rights Organization*, 441 U. S. 600, 617 (1979).

A court's role in discerning whether personal rights exist in the § 1983 context should therefore not differ from its role in discerning whether personal rights exist in the implied right of action context. Compare *Golden State Transit Corp.* v. *Los Angeles*, 493 U. S. 103, 107–108, n. 4 (1989) ("[A] claim based on a statutory violation is enforceable under § 1983 only when the statute creates 'rights, privileges, or immunities' in the particular plaintiff"), with *Cannon, supra,* at 690, n. 13 (statute is enforceable under implied right only where Congress "explicitly conferred a right directly on a class of persons that included the plaintiff in the case"). Both inquiries simply require a determination as to whether or not Congress intended to confer individual rights upon a class of beneficiaries. Compare *Wright*, 479 U. S., at 423 (statute must be "intended to rise to the level of an enforce-

---

"specific evidence from the statute itself," *Wright* v. *Roanoke Redevelopment and Housing Authority*, 479 U. S. 418, 423 (1987), or "impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983," *Blessing* v. *Freestone*, 520 U. S. 329, 341 (1997). See also *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1, 20 (1981). These questions do not arise in this case due to our conclusion that FERPA confers no individual rights and thus cannot give rise to a presumption of enforceability under § 1983.

able right"), with *Alexander* v. *Sandoval, supra,* at 289 (statute must evince "congressional intent to create new rights"); and *California* v. *Sierra Club, supra,* at 294 ("The question is not simply who would benefit from the Act, but whether Congress intended to confer federal rights upon those beneficiaries" (citing *Cannon, supra,* at 690–693, n. 13)). Accordingly, where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action.

JUSTICE STEVENS disagrees with this conclusion principally because separation-of-powers concerns are, in his view, more pronounced in the implied right of action context as opposed to the § 1983 context. *Post,* at 300–301 (dissenting opinion) (citing *Wilder,* 496 U. S., at 509, n. 9). But we fail to see how relations between the branches are served by having courts apply a multifactor balancing test to pick and choose which federal requirements may be enforced by § 1983 and which may not. Nor are separation-of-powers concerns within the Federal Government the only guideposts in this sort of analysis. See *Will* v. *Michigan Dept. of State Police,* 491 U. S. 58, 65 (1989) ("[I]f Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute'" (quoting *Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234, 242 (1985); citing *Pennhurst State School and Hospital* v. *Halderman,* 465 U. S. 89, 99 (1984))).[5]

---

[5] This case illustrates the point well. JUSTICE STEVENS would conclude that Congress intended FERPA's nondisclosure provisions to confer individual rights on millions of school students from kindergarten through graduate school without having ever said so explicitly. This conclusion entails a judicial assumption, with no basis in statutory text, that Congress intended to set itself resolutely against a tradition of deference to state and local school officials, *e. g., Falvo,* 534 U. S., at 435 (rejecting proposed

With this principle in mind, there is no question that FERPA's nondisclosure provisions fail to confer enforceable rights. To begin with, the provisions entirely lack the sort of "rights-creating" language critical to showing the requisite congressional intent to create new rights. *Alexander* v. *Sandoval*, 532 U. S., at 288–289; *Cannon*, 441 U. S., at 690, n. 13. Unlike the individually focused terminology of Titles VI and IX ("No person . . . shall . . . be subjected to discrimination"), FERPA's provisions speak only to the Secretary of Education, directing that "[n]o funds shall be made available" to any "educational agency or institution" which has a prohibited "policy or practice." 20 U. S. C. § 1232g(b)(1). This focus is two steps removed from the interests of individual students and parents and clearly does not confer the sort of "*individual* entitlement" that is enforceable under § 1983. *Blessing*, 520 U. S., at 343 (emphasis in original). As we said in *Cannon:*

> "There would be far less reason to infer a private remedy in favor of individual persons if Congress, instead of drafting Title IX with an unmistakable focus on the benefited class, had written it simply as a ban on discriminatory conduct by recipients of federal funds or as a prohibition against the disbursement of public funds to educational institutions engaged in discriminatory practices." 441 U. S., at 690–693.

See also *Alexander* v. *Sandoval, supra,* at 289 ("Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons'" (quoting *California* v. *Sierra Club, supra,* at 294)).

---

interpretation of FERPA because "[w]e doubt Congress meant to intervene in this drastic fashion with traditional state functions"); *Regents of Univ. of Mich.* v. *Ewing,* 474 U. S. 214, 226 (1985) (noting tradition of "reluctance to trench on the prerogatives of state and local educational institutions"), by subjecting them to private suits for money damages whenever they fail to comply with a federal funding condition.

FERPA's nondisclosure provisions further speak only in terms of institutional policy and practice, not individual instances of disclosure. See §§ 1232g(b)(1)–(2) (prohibiting the funding of "any educational agency or institution which has a *policy or practice* of permitting the release of education records" (emphasis added)). Therefore, as in *Blessing,* they have an "aggregate" focus, 520 U. S., at 343, they are not concerned with "whether the needs of any particular person have been satisfied," *ibid.,* and they cannot "give rise to individual rights," *id.,* at 344. Recipient institutions can further avoid termination of funding so long as they "comply substantially" with the Act's requirements. § 1234c(a). This, too, is not unlike *Blessing,* which found that Title IV–D failed to support a § 1983 suit in part because it only required "substantial compliance" with federal regulations. 520 U. S., at 335, 343. Respondent directs our attention to subsection (b)(2), but the text and structure of subsections (b)(1) and (b)(2) are essentially the same.[6] In each provision the reference to individual consent is in the context of describing the type of "policy or practice" that triggers a funding prohi-

[6] Subsection (b)(2) provides in relevant part:

"No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of releasing, or providing access to, any personally identifiable information in education records other than directory information . . . unless—

"(A) there is written consent from the student's parents specifying records to be released, the reasons for such release, and to whom, and with a copy of the records to be released to the student's parents and the student if desired by the parents." 20 U. S. C. § 1232g(b)(2)(A).

Respondent invokes this provision to assert the very awkward "individualized right to withhold consent and prevent the unauthorized release of personally identifiable information in education records by an educational institution that has a policy or practice of releasing, or providing access to, such information." Brief for Respondent 14. That is a far cry from the sort of individualized, concrete monetary entitlement found enforceable in *Maine* v. *Thiboutot,* 448 U. S. 1 (1980), *Wright,* and *Wilder* v. *Virginia Hospital Assn.,* 496 U. S. 498 (1990). See *supra,* at 279–281.

bition. For reasons expressed repeatedly in our prior cases, however, such provisions cannot make out the requisite congressional intent to confer individual rights enforceable by § 1983.[7]

Our conclusion that FERPA's nondisclosure provisions fail to confer enforceable rights is buttressed by the mechanism that Congress chose to provide for enforcing those provisions. Congress expressly authorized the Secretary of Education to *"deal with violations"* of the Act, § 1232g(f) (emphasis added), and required the Secretary to "establish or designate [a] review board" for investigating and adjudicating such violations, § 1232g(g). Pursuant to these provisions, the Secretary created the Family Policy Compliance Office (FPCO) "to act as the Review Board required under the Act [and] to enforce the Act with respect to all applicable programs." 34 CFR §§ 99.60(a) and (b) (2001). The FPCO permits students and parents who suspect a violation of the Act to file individual written complaints. § 99.63. If a complaint is timely and contains required information, the FPCO will initiate an investigation, §§ 99.64(a)–(b), notify the educational institution of the charge, § 99.65(a), and request a written response, § 99.65. If a violation is found, the FPCO distributes a notice of factual findings and a "statement of the specific steps that the agency or institution must take to comply" with FERPA. §§ 99.66(b) and (c)(1). These admin-

---

[7] JUSTICE STEVENS would have us look to other provisions in FERPA that use the term "rights" to define the obligations of educational institutions that receive federal funds. See *post*, at 293–294, 296. He then suggests that any reference to "rights," even as a shorthand means of describing standards and procedures imposed on funding recipients, should give rise to a statute's enforceability under § 1983. *Ibid.* This argument was rejected in *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 18–20 (1981) (no presumption of enforceability merely because a statute "speaks in terms of 'rights'"), and it is particularly misplaced here since Congress enacted FERPA years before *Thiboutot* declared that statutes can ever give rise to rights enforceable by § 1983.

istrative procedures squarely distinguish this case from *Wright* and *Wilder,* where an aggrieved individual lacked any federal review mechanism, see *supra,* at 280–281, and further counsel against our finding a congressional intent to create individually enforceable private rights.[8]

Congress finally provided that "[e]xcept for the conduct of hearings, none of the functions of the Secretary under this section shall be carried out in any of the regional offices" of the Department of Education. 20 U. S. C. § 1232g(g). This centralized review provision was added just four months after FERPA's enactment due to "concern that regionalizing the enforcement of [FERPA] may lead to multiple interpretations of it, and possibly work a hardship on parents, students, and institutions." 120 Cong. Rec. 39863 (1974) (joint statement). Cf. *Wright,* 479 U. S., at 426 ("Congress' aim was to provide a *decentralized* . . . administrative process" (emphasis added; internal quotation marks omitted)). It is implausible to presume that the same Congress nonetheless intended private suits to be brought before thousands of federal- and state-court judges, which could only result in the sort of "multiple interpretations" the Act explicitly sought to avoid.

In sum, if Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms—no less and no more than what is required for Congress to create new rights enforceable under an implied private right of action. FERPA's nondisclosure provisions contain no rights-creating language, they have an aggregate, not individual, focus, and they serve primarily to direct the Secretary of Education's distribution of public funds to educational institutions. They therefore create no rights enforceable under § 1983. Accordingly, the judgment of the

---

[8] We need not determine whether FERPA's procedures are "sufficiently comprehensive" to offer an independent basis for precluding private enforcement, *Middlesex County Sewerage Authority,* 453 U. S., at 20, due to our finding that FERPA creates no private right to enforce.

Supreme Court of Washington is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE BREYER, with whom JUSTICE SOUTER joins, concurring in the judgment.

The ultimate question, in respect to whether private individuals may bring a lawsuit to enforce a federal statute, through 42 U. S. C. § 1983 or otherwise, is a question of congressional intent. In my view, the factors set forth in this Court's § 1983 cases are helpful indications of that intent. See, *e. g., Blessing* v. *Freestone,* 520 U. S. 329, 340–341 (1997); *Suter* v. *Artist M.,* 503 U. S. 347, 357 (1992); *Wilder* v. *Virginia Hospital Assn.,* 496 U. S. 498, 509–511 (1990); *Wright* v. *Roanoke Redevelopment and Housing Authority,* 479 U. S. 418, 423–427 (1987). But the statute books are too many, the laws too diverse, and their purposes too complex, for any single legal formula to offer more than general guidance. I would not, in effect, predetermine an outcome through the use of a presumption—such as the majority's presumption that a right is conferred only if set forth "unambiguously" in the statute's "text and structure." See *ante,* at 280, 288.

At the same time, I do not believe that Congress intended private judicial enforcement of this statute's "school record privacy" provisions. The Court mentions most of the considerations I find persuasive: The phrasing of the relevant prohibition (stating that "[n]o funds shall be made available" to institutions with a "policy or practice" of permitting the release of "education records"), see *ante,* at 288, n. 6, 288–289; the total absence (in the relevant statutory provision) of any reference to individual "rights" or the like, see *ante,* at 287; the related provisions that make clear, by creating administrative enforcement processes, that the Spending Clause was not simply a device to obtain federal jurisdiction,

see *ante,* at 289–290; and later statutory insistence upon centralized federal enforcement at the national, not the regional, level, see *ante,* at 290.

I would add one further reason. Much of the statute's key language is broad and nonspecific. The statute, for example, defines its key term, "education records," as (with certain enumerated exceptions) "those records, files, documents, and other materials which (i) contain information directly related to a student; and (ii) are maintained by an educational . . . institution." 20 U. S. C. § 1232g(a)(4)(A). This kind of language leaves schools uncertain as to just when they can, or cannot, reveal various kinds of information. It has led, or could lead, to legal claims that would limit, or forbid, such practices as peer grading, see *Owasso Independent School Dist. No. I–011* v. *Falvo,* 534 U. S. 426 (2002), teacher evaluations, see *Moore* v. *Hyche,* 761 F. Supp. 112 (ND Ala. 1991), school "honor society" recommendations, see *Price* v. *Young,* 580 F. Supp. 1 (ED Ark. 1983), or even roll call responses and "bad conduct" marks written down in class, see Tr. of Oral Arg. in *Falvo, supra,* O. T. 2001, No. 00–1073, pp. 37–38. And it is open to interpretations that invariably favor confidentiality almost irrespective of conflicting educational needs or the importance, or common sense, of limited disclosures in certain circumstances, say, where individuals are being considered for work with young children or other positions of trust.

Under these circumstances, Congress may well have wanted to make the agency remedy that it provided exclusive—both to achieve the expertise, uniformity, widespread consultation, and resulting administrative guidance that can accompany agency decisionmaking and to avoid the comparative risk of inconsistent interpretations and misincentives that can arise out of an occasional inappropriate application of the statute in a private action for damages. This factor, together with the others to which the majority refers, convinces me that Congress did not intend private judicial enforcement actions here.

JUSTICE STEVENS, with whom JUSTICE GINSBURG joins, dissenting.

The Court's *ratio decidendi* in this case has a "now you see it, now you don't" character. At times, the Court seems to hold that the Family Educational Rights and Privacy Act of 1974 (FERPA or Act), 20 U. S. C. § 1232g, simply does not create any federal rights, thereby disposing of the case with a negative answer to the question "whether Congress *intended to create a federal right,*" *ante,* at 283. This interpretation would explain the Court's studious avoidance of the rights-creating language in the title and the text of the Act. Alternatively, its opinion may be read as accepting the proposition that FERPA does indeed create both parental rights of access to student records and student rights of privacy in such records, but that those federal rights are of a lesser value because Congress did not intend them to be enforceable by their owners. See, *e. g., ante,* at 290 (requiring of respondent "no less and no more" than what is required of plaintiffs attempting to prove that a statute creates an implied right of action). I shall first explain why the statute does, indeed, create federal rights, and then explain why the Court's novel attempt to craft a new category of second-class statutory rights is misguided.

## I

Title 20 U. S. C. § 1232g, which embodies FERPA in its entirety, includes 10 subsections, which create rights for both students and their parents, and describe the procedures for enforcing and protecting those rights. Subsection (a)(1)(A) accords parents "the right to inspect and review the education records of their children."[1] Subsection (a)(1)(D) pro-

---

[1] The following portions of 20 U. S. C. §§ 1232g(a)(1)(A) and (B) identify the parents' right. After stating that no funds shall be made available to an institution that has a policy of denying parents "the right to inspect and review the education records of their children," subsection (a)(1)(A) clarifies that if an education record pertains to more than one student, "the parents of one of such students shall have the right to inspect and

vides that a "student or a person applying for admission" may waive "his right of access" to certain confidential statements. Two separate provisions protect students' privacy rights: subsection (a)(2) refers to "the privacy rights of students," and subsection (c) protects "the rights of privacy of students and their families." And subsection (d) provides that after a student has attained the age of 18, "the rights accorded to the parents of the student" shall thereafter be extended to the student. Given such explicit rights-creating language, the title of the statute, which describes "family educational rights," is appropriate: The entire statutory scheme was designed to protect such rights.

Of course, as we have stated previously, a "blanket approach" to determining whether a statute creates rights enforceable under 42 U. S. C. § 1983 (1994 ed., Supp. V) is inappropriate. *Blessing* v. *Freestone*, 520 U. S. 329, 344 (1997). The precise statutory provision at issue in this case is § 1232g(b).[2] Although the rights-creating language in this subsection is not as explicit as it is in other parts of the statute, it is clear that, in substance, § 1232g(b) formulates an individual right: in respondent's words, the "right of parents to withhold consent and prevent the unauthorized release of education record information by an educational

---

review only" the parts pertaining to that student. That subsection then provides that the educational institution "shall establish appropriate procedures" for the granting of parental requests for access within 45 days. *Ibid.* Subsection (a)(1)(B) also refers to the parents' "right to inspect and review the education records" of their children.

[2] In relevant part, § 1232g(b)(2) states that "[n]o funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of releasing, or providing access to, any personally identifiable information in education records other than directory information . . . unless" either "there is written consent from the student's parents specifying records to be released, the reasons for such release, and to whom, and with a copy of the records to be released to the student's parents and the student if desired by the parents," or a court order dictating release of information.

institution . . . that has a policy or practice of releasing such information." Brief for Respondent 11. This provision plainly meets the standards we articulated in *Blessing* for establishing a federal right: It is directed to the benefit of individual students and parents; the provision is binding on States, as it is "couched in mandatory, rather than precatory, terms"; and the right is far from " 'vague and amorphous,' " 520 U. S., at 340–341. Indeed, the right at issue is more specific and clear than rights previously found enforceable under § 1983 in *Wright* v. *Roanoke Redevelopment and Housing Authority*, 479 U. S. 418 (1987), and *Wilder* v. *Virginia Hospital Assn.*, 496 U. S. 498 (1990), both of which involved plaintiffs' entitlement to "reasonable" amounts of money.[3] As such, the federal right created by § 1232g(b) is "presumptively enforceable by § 1983," *ante*, at 284.

The Court claims that § 1232g(b), because it references a "policy or practice," has an aggregate focus and thus cannot qualify as an individual right. See *ante*, at 288 (emphasis deleted). But § 1232g(b) does not simply ban an institution from having a policy or practice—which would be a more systemic requirement. Rather, it permits a policy or practice of releasing information, *so long as* "there is written consent from the student's parents specifying records to be released, the reasons for such release, and to whom, and with a copy of the records to be released to the student's parents and the student if desired by the parents." 20 U. S. C. § 1232g(b)(2)(A). The provision speaks of the individual "student," not students generally. In light of FERPA's stated purpose to "protect such individuals' rights to privacy by limiting the transferability of their records without their consent," 120 Cong. Rec. 39862 (1974) (statement of Sen.

---

[3] In *Wright*, the right claimed was "that a 'reasonable' amount for utilities be included in rent that a [public housing authority] was allowed to charge." 479 U. S., at 430. In *Wilder*, health care providers asserted the right to "reasonable and adequate rates" from "States participating in the Medicaid program." 496 U. S., at 512.

Buckley), the individual focus of § 1232g(b) is manifest. Moreover, simply because a "pattern or practice" is a precondition to individual relief does not mean that the right asserted is not an individually enforceable right. Cf. *Monell* v. *New York City Dept. of Social Servs.*, 436 U. S. 658, 690–695 (1978) (authorizing municipal liability under § 1983 when a municipality's "policy or custom" has caused the violation of an individual's federal rights).

Although § 1232g(b) alone provides strong evidence that an individual federal right has been created, this conclusion is bolstered by viewing the provision in the overall context of FERPA. Not once in its opinion does the Court acknowledge the substantial number of references to "rights" in the FERPA provisions surrounding § 1232g(b), even though our past § 1983 cases have made clear that a given statutory provision's meaning is to be discerned "in light of the entire legislative enactment," *Suter* v. *Artist M.*, 503 U. S. 347, 357 (1992).[4] Rather, ignoring these provisions, the Court asserts that FERPA—not just § 1232g(b)—"entirely lack[s]" rights-creating language, *ante*, at 287. The Court also claims that "we have never before held . . . that spending legislation drafted in terms resembling those of FERPA can confer enforceable rights." *Ante*, at 279. In making this claim, the Court contrasts FERPA's "[n]o funds shall be made available" language with "individually focused termi-

---

[4] The Court correctly states that "rights" language alone does not necessarily create rights enforceable under § 1983, *ante*, at 289, n. 7 (quoting *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1 (1981)), but such language is certainly relevant to whether a statute creates rights, see *ante*, at 287 (describing "'rights-creating' language" as "critical to showing the requisite congressional intent to create new rights"). Moreover, in *Pennhurst*, the Court treated the "rights" language as the only arguable evidence that the statute created rights; here, the "'overall' or 'specific' purposes of the Act," 451 U. S., at 18, also show an intent to create individual rights. See *supra*, at 295 and this page (discussing FERPA's "stated purpose").

nology" characteristic of federal antidiscrimination statutes, such as "[n]o person . . . shall . . . be subjected to discrimination," *ante,* at 287. But the sort of rights-creating language idealized by the Court has *never* been present in our § 1983 cases; rather, such language ordinarily gives rise to an implied cause of action. See *Cannon* v. *University of Chicago,* 441 U. S. 677, 690, n. 13 (1979). None of our four most recent cases involving whether a Spending Clause statute created rights enforceable under § 1983—*Wright, Wilder, Suter,* and *Blessing*—involved the sort of "no person shall" rights-creating language envisioned by the Court. And in two of those cases—*Wright* and *Wilder*—we concluded that individual rights enforceable under § 1983 existed. See n. 3, *supra.*

Although a "presumptively enforceable" right, *ante,* at 284, has been created by § 1232g(b), one final question remains. As our cases recognize, Congress can rebut the presumption of enforcement under § 1983 either "expressly, by forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement [actions]." *Blessing,* 520 U. S., at 341. FERPA has not explicitly foreclosed enforcement under § 1983. The only question, then, is whether the administrative enforcement mechanisms provided by the statute are "comprehensive" and "incompatible" with § 1983 actions. As the Court explains, *ante,* at 289, FERPA authorizes the establishment of an administrative enforcement framework, and the Secretary of Education has created the Family Policy Compliance Office (FPCO) to "deal with violations" of the Act, 20 U. S. C. § 1232g(f). FPCO accepts complaints from the public concerning alleged FERPA violations and, if it so chooses, may follow up on such a complaint by informing institutions of the steps they must take to comply with FERPA, see 34 CFR §§ 99.63–99.67 (2001), and, in exceptional cases, by administrative adjudication against noncomplying institutions, see 20 U. S. C. § 1234. These ad-

ministrative avenues fall far short of what is necessary to overcome the presumption of enforceability. We have only found a comprehensive administrative scheme precluding enforceability under § 1983 in two of our past cases—*Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1 (1981), and *Smith* v. *Robinson*, 468 U. S. 992 (1984). In *Sea Clammers*, the relevant statute not only had "unusually elaborate enforcement provisions," but it also permitted private citizens to bring enforcement actions in court. 453 U. S., at 13–14. In *Smith*, the statute at issue provided for "carefully tailored" administrative proceedings followed by federal judicial review. 468 U. S., at 1009. In contrast, FERPA provides no guaranteed access to a formal administrative proceeding or to federal judicial review; rather, it leaves to administrative discretion the decision whether to follow up on individual complaints. As we said in *Blessing*, 520 U. S., at 348, the enforcement scheme here is "far more limited than those in *Sea Clammers* and *Smith*," and thus does not preclude enforcement under § 1983.[5]

---

[5] The Court does not test FERPA's administrative scheme against the "comprehensive enforcement scheme," *Blessing*, 520 U. S., at 341, standard for rebutting the presumptive enforceability of a federal right, *ante*, at 290, n. 8, because it concludes that there is no federal right to trigger this additional analysis. Yet, at the same time, the Court imports "enforcement scheme" considerations into the initial question whether the statute creates a presumptively enforceable right. See *ante*, at 289 ("Our conclusion that FERPA's nondisclosure provisions fail to confer enforceable rights is buttressed by the mechanism that Congress chose to provide for enforcing [FERPA violations]"). Folding such considerations into the rights question renders the rebuttal inquiry superfluous. Moreover, the Court's approach is inconsistent with our past cases, which have kept separate the inquiries whether there is a right and whether an enforcement scheme rebuts presumptive enforceability. Thus, the Court's discussion of the schemes in *Wright* v. *Roanoke Redevelopment and Housing Authority*, 479 U. S. 418 (1987), and *Wilder* v. *Virginia Hospital Assn.*, 496 U. S. 498 (1990), is inapposite, see *ante*, at 289–290, because neither of those cases considered the existence of an enforcement scheme relevant to whether a federal right had been created in the first instance.

## II

Since FERPA was enacted in 1974, all of the Federal Courts of Appeals expressly deciding the question have concluded that FERPA creates federal rights enforceable under § 1983.[6] Nearly all other federal and state courts reaching the issue agree with these Circuits.[7] Congress has not overruled these decisions by amending FERPA to expressly preclude recourse to § 1983. And yet, the Court departs from over a quarter century of settled law in concluding that FERPA creates no enforceable rights. Perhaps more pernicious than its disturbing of the settled status of FERPA rights, though, is the Court's novel use of our implied right of action cases in determining whether a federal right exists for § 1983 purposes.

In my analysis of whether § 1232g(b) creates a right for § 1983 purposes, I have assumed the Court's forthrightness in stating that the question presented is "whether Congress *intended to create a federal right*," *ante*, at 283, and that "[p]laintiffs suing under § 1983 do not have the burden of showing an intent to create a private remedy," *ante*, at 284. Rather than proceeding with a straightforward analysis

---

[6] See *Falvo* v. *Owasso Independent School Dist. No. I–011*, 233 F. 3d 1203, 1210 (CA10 2000), rev'd on other grounds, 534 U. S. 426 (2002); *Tarka* v. *Cunningham*, 917 F. 2d 890, 891 (CA5 1990); *Brown* v. *Oneonta*, 106 F. 3d 1125, 1131 (CA2 1997) (citing *Fay* v. *South Colonie Central School Dist.*, 802 F. 2d 21, 33 (CA2 1986)). The Court does not cite—nor can it— a circuit or state high court opinion to the contrary. See *ante*, at 278, n. 2.

[7] To justify its statement that courts are "divided," *ante*, at 278, concerning FERPA's enforceability under § 1983, the Court cites only *two* cases disagreeing with the overwhelming majority position of courts reaching the issue. See *ante*, at 278, n. 2 (citing *Gundlach* v. *Reinstein*, 924 F. Supp. 684 (ED Pa. 1996), aff'd, 114 F. 3d 1172 (CA3 1997), and *Meury* v. *Eagle-Union Community School Corp.*, 714 N. E. 2d 233, 239 (Ind. Ct. App. 1999)). And *Gundlach* did not even squarely hold that FERPA rights are unenforceable; rather, the court merely rejected a claim under § 1232 in which the plaintiff "failed to allege that Defendants released the alleged educational records pursuant to university policy," 924 F. Supp., at 692.

under these principles, however, the Court has undermined both of these assertions by needlessly borrowing from cases involving implied rights of action—cases which place a more exacting standard on plaintiffs. See *ante*, at 283–286. By using these cases, the Court now appears to require a heightened showing from § 1983 plaintiffs: "[I]f Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms—no less and no more than what is required for Congress to create new rights enforceable under an implied private right of action." *Ante*, at 290.

A requirement that Congress intend a "right to support a cause of action," *ante*, at 283, as opposed to simply the creation of an individual federal right, makes sense in the implied right of action context. As we have explained, our implied right of action cases "reflec[t] a concern, grounded in separation of powers, that Congress rather than the courts controls the availability of remedies for violations of statutes." *Wilder*, 496 U. S., at 509, n. 9. However, imposing the implied right of action framework upon the § 1983 inquiry, see *ante*, at 283–286, is not necessary: The separation-of-powers concerns present in the implied right of action context "are not present in a § 1983 case," because Congress expressly authorized private suits in § 1983 itself. *Wilder*, 496 U. S., at 509, n. 9. Nor is it consistent with our precedent, which has always treated the implied right of action and § 1983 inquiries as separate. See, *e. g., ibid.*[8]

It has been long recognized that the pertinent question in determining whether a statute provides a basis for a § 1983 suit is whether Congress intended to create individual rights binding on States—as opposed to mere "precatory terms" that do not "unambiguously" create state obligations, *Penn-*

---

[8] Indeed, endorsing such a framework *sub silentio* overrules cases such as *Wright* and *Wilder*. In those cases we concluded that the statutes at issue created rights enforceable under § 1983, but the statutes did not "clear[ly] and unambiguous[ly]," *ante*, at 290, intend *enforceability under § 1983*.

*hurst State School and Hospital* v. *Halderman,* 451 U. S. 1, 17, 18 (1981), or "generalized," *"systemwide"* duties on States, *Blessing,* 520 U. S., at 343; *Suter,* 503 U. S., at 363. What has never before been required is congressional intent specifically to make the right *enforceable under § 1983.* Yet that is exactly what the Court, at points, appears to require by relying on implied right of action cases: the Court now asks whether "Congress nonetheless intended private suits to be brought before thousands of federal- and state-court judges," *ante,* at 290.

If it were true, as the Court claims, that the implied right of action and § 1983 inquiries neatly "overlap in one meaningful respect—in either case we must first determine whether Congress *intended to create a federal right,*" *ante,* at 283, then I would have less trouble referencing implied right of action precedent to determine whether a federal right exists. Contrary to the Court's suggestion, however, our implied right of action cases do not necessarily cleanly separate out the "right" question from the "cause of action" question. For example, in the discussion of rights-creating language in *Cannon* v. *University of Chicago,* 441 U. S. 677 (1979), which the Court characterizes as pertaining only to whether there is a right, *ante,* at 287, *Cannon's* reasoning is explicitly based on whether there is "reason to infer a private remedy," 441 U. S., at 691, and the "propriety of implication of a cause of action," *id.,* at 690, n. 13. Because *Cannon* and other implied right of action cases do not clearly distinguish the questions of "right" and "cause of action," it is inappropriate to use these cases to determine whether a statute creates rights enforceable under § 1983.

The Court, however, asserts that it has not imported the entire implied right of action inquiry into the § 1983 context, explaining that while § 1983 plaintiffs share with implied right of action plaintiffs the burden of establishing a federal right, § 1983 plaintiffs "do not have the burden of showing an intent to create a private remedy because § 1983 generally

supplies a remedy for the vindication of rights secured by federal statutes." *Ante,* at 284. If the Court has not adopted such a requirement in the § 1983 context—which it purports not to have done—then there should be no difference between the Court's "new" approach to discerning a federal right in the § 1983 context and the test we have "traditionally" used, as articulated in *Blessing:* whether Congress intended to benefit individual plaintiffs, whether the right asserted is not "'vague and amorphous,'" and whether Congress has placed a binding obligation on the State with respect to the right asserted. 520 U. S., at 340–341. Indeed, the Court's analysis, in part, closely tracks *Blessing*'s factors, as it examines the statute's language, and the asserted right's individual versus systematic thrust. See *ante,* at 287–289.

The Court's opinion in other places, however, appears to require more of plaintiffs. By defining the § 1983 plaintiff's burden concerning "whether a statute confers any right at all," *ante,* at 285, as whether "Congress nonetheless intended private suits to be brought before thousands of federal- and state-court judges," *ante,* at 290, the Court has collapsed the ostensible two parts of the implied right of action test ("is there a right" and "is it enforceable") into one. As a result, and despite its statement to the contrary, *ante,* at 284, the Court seems to place the unwarranted "burden of showing an intent to create a private remedy," *ibid.,* on § 1983 plaintiffs. Moreover, by circularly defining a right actionable under § 1983 as, in essence, "a right which Congress intended to make enforceable," the Court has eroded—if not eviscerated—the long-established principle of presumptive enforceability of rights under § 1983. Under this reading of the Court's opinion, a right under *Blessing* is second class compared to a right whose enforcement Congress has clearly intended. Creating such a hierarchy of rights is not only

novel, but it blurs the long-recognized distinction between rights and remedies. And it does nothing to clarify our § 1983 jurisprudence.

Accordingly, I respectfully dissent.