**KATIE A., et al., Plaintiffs,**

v.

**Diana BONTÁ, et al., Defendants.**

**No. CV02–5662 AHM(SHX).**

United States District Court,
C.D. California.

March 14, 2006.

Alison Barkoff, Ira Burnim, Washington, DC, Alissa Beth Kolek, Carlyle W. Hall, III, Robert Garcia, Robert D. Newman, Ronald C. Peterson, Heller Ehrman White & McAuliffe, Benjamin E. Wizner, Mark D. Rosenbaum, Aclu Foundation of Southern California, Katrina McIntosh, Kimberly Lewis, Laura N. Diamond, Marilyn Holle, Melinda R. Bird, Protection & Advocacy, Los Angeles, CA, Gina L. Zaragoza–Cruz, Gina L. Zaragoza–Cruz Law Offices, Woodland Hills, CA, John F. O'Toole, Patrick H. Gardner, National Center for Youth Law, Oakland, CA, Lew Hollman, Lin Min Kong, Santa Monica, CA, for Plaintiffs.

Catherine J. Pratt, Jerry M. Custis, Children Services Division, Monterey Plaza, CA, Erik S. Pitchal, Ira P. Lustbader,

Marcia Robinson Lowry, Children's Rights, New York City, Jennifer M. Kim, Sandra L. Goldsmith, Office of the Attorney General, Lionel Z. Glancy, Glancy & Binkow, Brandon T. Nichols, Los Angeles County Counsel, Los Angeles, CA, for Defendants.

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

MATZ, District Judge.

## TABLE OF CONTENTS

I.  *INTRODUCTION* ................................................1067

II. *DISCUSSION* ..................................................1069
    A.  *Legal Standard for Preliminary Injunctions* ...........................1069
    B.  *Standing* ................................................1070
    C.  *Does the Medicaid Act Require That California Provide Wraparound Services and Therapeutic Foster Care to Plaintiffs?* ...................1071
        1.  Are They Services? .........................................1071
        2.  Does EPSDT Require Wraparound and Therapeutic Foster Care? .......1074

III. *CONCLUSION* .................................................1078

## I.  *INTRODUCTION*

Plaintiffs are five troubled children with unmet mental health needs who were, at the time this suit was filed, in the custody of the Los Angeles County Department of Children and Family Services ("DCFS").

Defendants are Sandra Shewry, the current Director of the California Department of Health Services ("DHS"), and Dennis Boyle, the current Director of the California Department of Social Services ("DSS") (collectively, the "State Defendants").[1]

Plaintiffs in their First Amended Complaint ("FAC") allege that for foster children with "behavioral, emotional or psychiatric impairment[s]," FAC ¶ 37, adequate mental health services include, among other things, wraparound services and therapeutic foster care. Plaintiffs allege, and State Defendants agree, that virtually all foster children in California receive, or are eligible to receive, their health care services through Medi–Cal, which is California's Medicaid program. *Id.* ¶ 3; Answer ¶ 3. This means, according to Plaintiffs,

that virtually all foster children in California who have "behavioral, emotional or psychiatric impairments" are entitled to wraparound services and/or therapeutic foster care where such services are medically appropriate.

Over Defendants' opposition, on June 18, 2003, the Court certified the following class:

> [C]hildren in California who (a) are in foster care or are at imminent risk of foster care placement; and (b) have a mental illness or condition that has been documented or, had an assessment already been conducted, would have been documented; and (c) who need individualized mental health services, including but not limited to professionally acceptable assessments, behavioral support and case management services, family support, crisis support, therapeutic foster care and other necessary services in the home or in a home-like setting, to treat or ameliorate their illness or condition.

---

1.  Shewry's predecessor was Diana Bontá. Boyle's predecessor was Rita Saenz.

Order Re Class Certification [of Statewide Class].[2]

On September 9, 2005, Plaintiffs filed a motion seeking a mandatory preliminary injunction requiring the State Defendants to provide wraparound services and therapeutic foster care to all members of the statewide class, within 60 days from the entry of an order granting the motion.[3] The proposed injunction would require Plaintiffs and the State Defendants to meet and confer to develop an implementation plan and to submit a joint status report thereafter. The Court conducted a hearing on October 31, 2005, and requested additional briefing. The supplemental briefs have helped clarify the issues and very recent decisions have reinforced the Court's initial view that Plaintiffs have satisfied the necessary prerequisites for injunctive relief.

Given the passage of time and the competing demands of the Court's caseload, in certain respects this Order necessarily will be streamlined. Thus, for example, because the parties are fully familiar with their respective contentions, the Court will not set forth in detail their arguments nor deal with all the voluminous evidence they proffered. Nevertheless, I am compelled to precede this analysis of the motion with relevant observations about this case.

First, at stake in this lawsuit is the health of thousands of children in California who are already in, or are likely soon to wind up in, foster care.[4] "[C]hildren with serious emotional disabilities are among the most fragile members of our society; their medical needs frequently extend across a spectrum of service providers and state agencies." *Rosie D. v. Romney,* 410 F.Supp.2d 18, 23–24 (D.Mass. 2006). The class of plaintiffs here, like the emotionally disturbed children in *Rosie D.,* have "complex needs [and are] particularly vulnerable." *Id.* at 33–34. Indeed, Plaintiffs' needs are so compelling that Congress afforded them "rights" embodied in a federal statute. The statute is difficult to apply, however, which has led to this complex, hard-fought litigation, with the usual attendant delays and diversion of resources in determining the scope of assistance to which the class members are entitled. Even though the Government has agreed to provide aid to these children and has an interest in doing so, the adversary process risks swallowing up and interfering with both sides' mutual objectives.

---

**2.** Plaintiffs' FAC also named the Los Angeles County DCFS and its Director, Anita Block, as defendants (collectively, "the County Defendants"). On July 16, 2003, the Court conducted a fairness hearing on a tentative settlement agreement reached between Plaintiffs and County Defendants on behalf of a subclass of children who are in the custody of DCFS, or have been referred to or are subject to referral to DCFS. The Court approved the settlement. *See* Stipulated Order Re Final Approval of Class Settlement (July 16, 2003) and Stipulation Between Plaintiffs and County Defendants Regarding Definition of Class Members (Feb. 23, 2004).

Although the present motion does not involve the County Defendants directly, they have expressed their views on the issue by filing a "Statement of Position Re: Plaintiffs'

Motion for Preliminary Injunction." In short, the County states that it "is committed and able to meet its obligations within the existing Medi–Cal structure but would benefit from the changes proposed by Plaintiffs .... Should Plaintiffs prevail ... the County will be able to meet its obligations more easily and this will necessarily help to enure to the benefit of the children and family it serves."

**3.** Defendants do not dispute that currently they are not providing these forms of assistance, as such, to members of the plaintiff class.

**4.** As of July 1, 2004, over 85,000 children were in child welfare-supervised foster care in California. Pls.' Ex. 106.

In addition to the needs and rights of foster children, also at stake is the impact on the State of California of complying with requirements of the Medicaid Act when the State's budgetary and administrative resources are badly strapped and the range of Medicaid-mandated services continually become ever-costlier.[5]

Finally, also at issue here is the capacity of any court to enforce a decree entailing the delivery of services to mentally-troubled youngsters caught up in a complex social welfare system that is, to say the least, beleaguered. In California, the foster care system has been widely acknowledged to be failing. Can "EPSDT" (Early and Periodic, Screening, Diagnostic and Treatment Services) for children, to which Plaintiffs have a right, really provide significant benefits through wraparound services and therapeutic foster care? Perhaps the Court should not ponder that question. Perhaps the Court should do nothing more than simply recognize that these forms of treatment are part of Plaintiffs' EPSDT rights, and enforce them. From the hard lessons this Court has learned in enforcing the judgment in *Emily Q. v. Bonta*, 208 F.Supp.2d 1078 (C.D.Cal.2001), however, information about just how much the welfare of foster children will improve as a result of the requested injunction cannot be considered superfluous.

## II. DISCUSSION

### A. Legal Standard for Preliminary Injunctions

■ The parties do not dispute the legal standard for issuance of a preliminary injunction:

> To obtain a preliminary injunction in the district court, plaintiffs [must] demonstrate (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiffs if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiffs, and (4) advancement of the public interest .... Alternatively, injunctive relief could be granted if the plaintiffs demonstrate[ ] either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in their favor .... These two alternatives represent extremes of a single continuum, rather than two separate tests .... As a result, the greater the relative hardship to the party seeking the preliminary injunction, the less probability of success must be established by the party .....

*Rodde v. Bonta*, 357 F.3d 988, 994 (9th Cir.2004) (citations, internal quotation marks, and alterations omitted). In addition, "[m]andatory preliminary relief, which goes well beyond simply maintaining the status quo Pendente lite, is particularly

---

5. Because the Court need not deal directly with the claims asserted under the Americans with Disabilities Act and Rehabilitation Act, *see infra*, the Court does not analyze the State Defendants' arguments that the State's limited resources militate against imposing wraparound and therapeutic foster care on a statewide basis. *See Olmstead v. L.C. ex. rel. Zimring*, 527 U.S. 581, 603, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999). This decision concerns only the Medicaid Act, and as stated in *Ark. Med. Soc'y, Inc. v. Reynolds*, 6 F.3d 519, 531 (8th Cir.1993), a state "may take ... budget factors into consideration when setting its reimbursement methodology," but it "may not ignore the Medicaid Act's requirements in order to suit budgetary needs." In any event, there is substantial evidence that wraparound services and therapeutic foster care actually save the State money, compared to alternatives involving institutionalization. *See, e.g.*, Bruns Decl. ¶ 22(b)-(c); Kamradt Decl. ¶¶ 16–17; Chamberlain Decl. ¶ 26; Farr Decl. ¶ 20; *see also* Pls.' Ex. 135 at 969, Ex. 136 at 971–72, Ex. 137 at 974.

disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir.1979).

### B. *Standing*

■ As previously noted, Plaintiffs' substantive claims are based primarily on the Medicaid Act. The key statutory provisions at issue are 42 U.S.C. §§ 1396a(a), 1396d(a) and 1396d(r). As a threshold matter, the State Defendants contend that Plaintiffs do not have a private right of action to bring a suit under 42 U.S.C. § 1983 for violations of these provisions of the Medicaid Act.

The applicable test for standing is set forth in *Blessing v. Freestone*, 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). As stated in *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 602 (5th Cir.2004),

In *Blessing* ... the Supreme Court reiterated the three factors that it has traditionally considered when determining whether a particular federal statute gives rise to a right enforceable by § 1983:(1) whether Congress intended for the provision to benefit the plaintiff; (2) whether the plaintiff can show that the right in question is not so "vague and amorphous" that its enforcement would "strain judicial competence"; and (3) whether the statute unambiguously imposes a binding obligation on the states.

In *Gonzaga Univ. v. Doe*, 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002), the Supreme Court held that a former university student could not bring a § 1983 suit for alleged violations of the Family Educational Rights and Privacy Act because that statute had an "aggregate focus" and did not contain rights-creating language targeting a specific, identifiable group of individuals:

We ... reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983. Section 1983 provides a remedy only for the deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the United States. Accordingly, it is rights, not the broader or vaguer "benefits" or "interests," that may be enforced under the authority of that section.

*Id.* at 283, 122 S.Ct. 2268.

[Where a] provision focuse[s] on "the *aggregate services* provided by the State," *rather than "the needs of any particular person,"* it confer[s] no individual rights and thus could not be enforced by § 1983.

*Id.* at 282, 122 S.Ct. 2268 (quoting *Blessing*, 520 U.S. at 343, 117 S.Ct. 1353) (emphasis added). Following *Gonzaga*, in deciding whether a statute gives rise to an enforceable right under § 1983, courts have looked to whether Congress intended that a specific, identifiable class of individuals benefit from the statute.

Some six weeks ago, the Ninth Circuit held that the main subsection of section 1396a(a) on which Plaintiffs here rely—§ 1396a(a)(10) [6]—"creates an individual right enforceable under section 1983." *Watson v. Weeks*, 436 F.3d 1152, 1155 (9th Cir.2006). The decision in *Watson* contains a useful review of the "Medicaid Framework" and "of the applicable law for determining whether a particular federal

---

**6.** The precise provision is 42 U.S.C. § 1396a(a)(10)(A)(I), which in essence provides that a Medicaid-funded "State plan for medical assistance must ... provide for making medical assistance available" to various recipients specified elsewhere. Those recipients include "individuals ... under the age of 21." 42 U.S.C. § 1396d(a)(4)(B). "Medical assistance" includes payment for EPSDT. *Id.*

statute can be·enforced through a private right of action under section 1983." *Id.* at 1157–62. It is unnecessary to set forth that review here, and I will not do so. It is sufficient to note that in ruling that § 1396a(a)(10) creates a private right of action enforceable under § 1983, the Ninth Circuit "join[ed] five federal circuits that have already so held." *Id.* at 1159. Also, the court distinguished *Sanchez v. Johnson,* 416 F.3d 1051 (9th Cir.2005), the case on which the State Defendants mainly rely, by contrasting the Medicaid Act provision involved in that case (§ 1396a(a)(30)(A)) with the one involved in *Watson* (and here)— § 1396a(a)(10)(A). *Id.* at 1161. In short, under *Watson* Plaintiffs do have standing.

### C. Does the Medicaid Act Require That California Provide Wraparound Services and Therapeutic Foster Care to Plaintiffs?

#### 1. Are They Services?

Defendants do not dispute that by voluntarily participating in Medicaid through its Medi–Cal program, California is required to "comply with certain requirements imposed by the Act and regulations promulgated by the Secretary of Health and Human Services ...." *Wilder v. Va. Hosp. Ass'n,* 496 U.S. 498, 502, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). Nor do they dispute that the Medicaid Act requires the provision of EPSDT to Medicaid-eligible children under the age of twenty-one, 42 U.S.C. § 1396d(a)(4)(B); that EPSDT requires the State to screen eligible children "to determine the existence of certain physical or mental illnesses or conditions," 42 U.S.C. § 1396d(r)(1)(A)(ii); and that the Act requires the State "to correct or ame-

liorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan." 42 U.S.C. § 1396d(r)(5).

▇ What the State Defendants do dispute is that "wraparound services" and "therapeutic foster care" are EPSDT *services* and are "medically necessary." They contend that the Medicaid Act only applies to "services" and that wraparound and therapeutic foster care are not "services" *per se,* but rather "approaches" or "processes" or "philosophies" regarding the delivery of health care. *See, e.g.,* Barthels Depo., Vol. 1 at 82:14–18; Grayson Depo. at 30:7–14. In a related vein, the State Defendants also complain that "Plaintiffs have not only failed to define, but have obstreperously resisted defining, what they mean by the terms 'wraparound services' and 'therapeutic foster care.' "

Throughout much of this litigation this Court has pressed Plaintiffs to specify, in as concrete a manner possible, the precise forms of assistance that "wraparound services" and "therapeutic foster care" entail. Plaintiffs now have done so, at least to the extent necessary to refute the State Defendants' objections that they cannot understand what such assistance consists of and should not be ordered to do something that they cannot understand.

As to "wraparound services," Plaintiffs have provided a statutory reference point.[7] Plaintiffs also have defined "wraparound" as follows:

> Providers of wraparound care services: (a) engage in a unique assessment and treatment planning process that is characterized by the formation of a child,

---

**7.** It is California Welfare and Institutions Code § 18251(d), which describes "community based intervention services that emphasize the strengths of the child and family and

[that] include[ ] the delivery of coordinated, highly individualized unconditional services to address needs and achieve positive outcomes in their lives."

family, and multi-agency team (b) marshal community and natural supports through intensive case management and (c) make available an array of therapeutic interventions, which may include behavioral support services, crisis planning and intervention, parent coaching and education, mobile therapy, and medication monitoring.

McCabe Decl., Ex. D, App. A at 1. In addition, Plaintiffs have provided a nine page chart breaking down each of the nine identified component services of wraparound services. For each component service, they presented a detailed definition of what that service entails, the qualifications of the rendering providers (*e.g.*, "Staff with BA/BS in MH-related field or with 2 years experience in Mental Health"), and the specific provision(s) of the Medicaid Act under which, they contend, California must provide that service. Plaintiffs set forth these detailed definitions in an "Appendix A" to their answers to interrogatories.

As to "therapeutic foster care," Plaintiffs have described that component of the requested mandatory injunction as "an intensive, individualized health service provided to a child in a family setting, utilizing specially trained and intensively supervised foster parents." These programs:

(a) place a child singly, or at most in pairs, with a foster parent who is carefully selected, trained, and supervised and matched with the child's needs; (b) create, through a team approach, an individualized treatment plan that builds on the child's strengths; (c) empower the therapeutic foster parent to act as a central agent in implementing the child's treatment plan; (d) provide intensive oversight of the child's treatment, often through daily contact with the foster parent; (e) make available an array of therapeutic interventions to the child, the child's family, and the foster family (interventions may include behavioral support services for the child, crisis planning and intervention, coaching and education for the foster parent and the child's family, and medication monitoring); and (f) enable the child to successfully transition from therapeutic foster care to placement with the child's family or alternative family placement by continuing to provide therapeutic interventions.

McCabe Decl., Ex. D, App. B at 1. In addition, Plaintiffs proffered a seven page chart breaking down each of the seven component services of therapeutic foster care, the requisite qualifications of the providers, and the statutory authorization. *Id.* Plaintiffs specified these aspects of therapeutic foster care as "Appendix B" to their answers to certain interrogatories.[8]

Are Appendices A and B mere words that provide only an illusion of medically necessary services? Are they highfalutin sentiments devoid of practical application? Is what Justice Cardozo once wrote applicable: "We seek to find peace of mind in the word, the formula, the ritual. The hope is an illusion." Benjamin N. Cardozo, The Growth of the Law, pp. 66–67 (1924). Or do Appendices A and B merely reflect that "[t]he only tool [that] the lawyer [has] is words. We have no marvelous pills to prescribe for our patients . . . . Whether we are trying a case, writing a brief, drafting a contract, or negotiating with an adversary, words are the only things we have to work with." Charles Alan Wright, Book Review, Townes Hall Notes, Spring 1988, at 5.

It is perhaps inevitable that in defining and describing these disputed means of

8. Henceforth, in this opinion the charts **that were** attached as the appendices to the McCabe Declaration shall be referred to as Appendix A and Appendix B.

treatment for mentally ill children ("wraparound services" and "therapeutic foster care"), Plaintiffs included imprecise terms, bordering on jargon. Nevertheless, I find that the physicians, therapists, social workers, teachers, counselors, parents and others who are necessary providers of EPSDT surely are able to convert these words into meaningful services.

And services they are. Defendants understandably prefer to characterize "wraparound" and "therapeutic foster care" as "processes" or "approaches" or "philosophies," because those words are not in the Medicaid Act—only "services" are mandated.[9] But to relegate "wraparound" and "therapeutic foster care" to some realm other than "services," as the State Defendants seek to do, is akin to limiting the

classification of a criminal defense attorney's "services" to only his advice and in-court representation, while excluding his necessary efforts at coordinating the professional work of others, such as an investigator, jury consultant or sentencing consultant. Often the client is assisted by a team of professionals, and a key, necessary "service" of the lawyer is to coordinate these professionals' respective services. To extend the analogy further, a criminal defense attorney will also rely on (and help shape) the participation of the client himself in his coordinated defense. So, too, in "wraparound" a core element of that service is "family voice and choice," i.e., family participation in and contribution to the array of treatment. See Bruns Decl. ¶ 26.[10]

9. The State Defendants argue that "[m]ost of Plaintiffs' declarations do not state, or even suggest, that 'wraparound services' or 'therapeutic foster care' are Medicaid covered services as such." Opp'n at 21. Defendants then review several of the declarations submitted by Plaintiffs' experts—e.g., those of Eric Bruns, Ph.D.; Ira Lourie, M.D.; Robert Friedman, Ph.D.; Patricia Chamberlain, Ph.D. With respect to each, Defendants argue that: (1) the expert does not explicitly refer to "wraparound services" and "therapeutic foster care" as "services" per se and (2) the expert has not claimed that wraparound services and therapeutic foster care are covered by Medicaid. These arguments are not persuasive.

First, that Defendants have combed through these declarations and have been able to locate instances where the terms "wraparound" or "therapeutic foster care" are found alongside the words "process," "program," or "practice" (instead of the word "service") does not mean that they are not services. Indeed, such games can be played with the opposite effect. Plaintiffs have pointed out occasions where the State has itself referred to wraparound as a "service"—e.g., California's "Wrap–Around Services Pilot Project." Opp'n at 13 (emphasis added). Also, California Welfare and Institutions Code § 18250(d)—a statute—also refers to "Wraparound services."

Second, that Plaintiffs' medical and behavioral experts do not also opine on whether the EPSDT provisions of the Medicaid Act cover wraparound services and foster care is of no consequence. Plaintiffs rely on different experts to establish that point. See below.

10. Defendants quote out of context and in a misleading manner this Court's observation in Emily Q. that "[t]he wraparound process is not a program or a type of service." Emily Q., 208 F.Supp.2d at 1091. What the Court actually noted in that limited portion of a 28 page opinion dealing with Therapeutic Behavioral Services ("TBS") was that "TBS is one type of a broad variety of individualized services that may be used in a 'wraparound' process. The wraparound process is not a program or a type of service. [It] can include any combination of services and support." (emphasis added.) To infer from the middle sentence that something that consists of a combination of services and supports is not in itself a "service" within the meaning of the Medicaid Act makes no sense. See Farr Decl. ¶ 23 n. 1 ("[R]eferring to Wraparound as a process ... do[es] not mean ... that it is not a mental health service. Individual and group therapy and case management services, for instance, can all be described as processes, but they are unquestionably mental health services. The same is true for Wraparound.")

2. **Does EPSDT Require Wraparound and Therapeutic Foster Care?**

[redacted] The State Defendants proceed to argue that even if "wraparound" and "therapeutic foster care" are services, the Medicaid-mandated provision of EPSDT does not encompass them. Section 1396d(r) lists an array of services that states are required to provide to children under age twenty-one. Plaintiffs rely primarily on § 1396d(r)(5), a catch-all provision, which requires that states render "[s]uch other necessary health care, diagnostic services, treatment, and other measures described in subsection (a) of this section to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services ...." The State Defendants contend that this language means that such states need only provide those services expressly listed in § 1396(d)(a).

[redacted] The Court disagrees. Section 1396d(a) identifies twenty-eight different services, including diagnostic services, psychiatric services, rehabilitative services and case management services. To be sure, the statute does not mention "wraparound services" and "therapeutic foster care," but a specific service, although not expressly listed in § 1396d(a), may nevertheless fall under one of the other twenty-eight categories. *See, e.g., Pediatric Specialty Care, Inc. v. Ark. Dep't. of Human Servs.*, 293 F.3d 472, 480–481 (8th Cir. 2002) ("early intervention day treatment" required under § 1396d(a)(13) (rehabilitative services)); *Collins v. Hamilton*, 349 F.3d 371, 376 (7th Cir.2003) ("psychiatric residential treatment facilities" required under § 1396d(a)(16) (inpatient psychiatric hospital services)); *Emily Q.*, 208 F.Supp.2d at 1090 ("therapeutic behavioral services" required under EPSDT). "Congress did not grant or allow states the discretion to define what types of health care and services would be provided to EPSDT children ...." *S.D.*, 391 F.3d at 593. As stated in *Rosie D., supra*, "the *only* limit placed on the provision of EPSDT services is the requirement that they be 'medically necessary' ...." *Rosie D.*, at 25–26 (emphasis added). "[I]f a licensed clinician finds a particular service to be medically necessary to help a child improve his or her functional level, this service must be paid for by a state's Medicaid plan pursuant to the EPSDT mandate." *Id.*

Wraparound services has nine component services; therapeutic foster care has seven. Each component service has numerous subcomponent services. Each subcomponent may fall under any one or more of the twenty-eight different categories of § 1396d(a). The three categories Plaintiffs claim to be most frequently applicable are: "rehabilitative services," 42 U.S.C. § 1396d(a)(13); "case management services," 42 U.S.C. § 1396d(a)(19); and "personal care services," 42 U.S.C. § 1396d(a)(24). Plaintiffs' supplemental interrogatory responses described above (Appendices A and B) link, in chart form, each component of wraparound services and therapeutic foster care service to the corresponding category or categories of § 1396d(a). The declaration of Chris Koyanagi provides a similar breakdown. Koyanagi Decl. ¶¶ 23–31.[11] The Court finds it

11. Ms. Koyanagi is the Policy Director of the Washington, D.C.-based Bazelon Center for Mental Health Law, which is one of the counsel for Plaintiffs. She works with the federal Center for Medicare and Medicaid Services and the federal Substance Abuse and Mental Health Services Administration. She was the primary author of "Making Sense of Medicaid for Children with Serious Emotional Disturbance." *Id.* ¶ 10 and Ex. 2. That definitive study "demonstrated that wraparound and therapeutic foster care can be covered by

likely that virtually all of the corresponding categories of § 1396d(a) identified by Plaintiffs do, in fact, encompass the linked-to service.[12]

The State Defendants do not directly rebut or even challenge Ms. Koyanagi's categorizations. Instead, they merely point to a June 28, 2005 report by the federal Government Accountability Office ("G.A.O.") that proposes numerous legislative reforms to Medicaid, one of which aims to address the use of categories such as "rehabilitation services" to improperly bill the federal government for services "that are intrinsic elements of non-Medicaid programs." *See* Defs.' Ex. 103 at 168. Even assuming that in principle the G.A.O. report could be relevant, it is of no help to State Defendants. It does not discuss EPSDT or wraparound services and therapeutic foster care. Moreover, it confirms that "Medicaid payments *will be* available for appropriate rehabilitation services that are intended for the maximum reduction of physical or mental disability and measura-

ble restoration of an individual to the best possible functional level." *Id.* (emphasis in original).

In short, wraparound services and therapeutic foster care fall within the EPSDT obligations of Medicaid-participating states. This conclusion is buttressed by the fact that in other states wraparound services and therapeutic foster care programs have been funded by Medicaid. For example, Linda Huff Redman, Ph.D., the former Deputy Director of Arizona's Medicaid Program, states that Arizona uses Medicaid funding for EPSDT to pay for almost all of the component services of therapeutic foster care—the only exclusions being "room and board expenses and the one-time or occasional goods and/or services needed to support the child and their family (e.g., refrigerator, clothes)." [13] Redman Decl. ¶¶ 3, 18–26. Nineteen other states[14] also provide therapeutic foster care as a "mental health service paid for by Medicaid and billed using codes in the 'Healthcare Common Procedure Coding

Medicaid," *id.* ¶ 22, and that states "regularly" receive Medicaid funding for such services. *Id.* ¶ 26.

**12.** For example, the first component service of wraparound services is "Engagement of the Child and Family." *See* Appendix A at 2. A subcomponent of that service is to "organize[ ] an initial meeting with the child and family [to] explain[ ] wraparound care services ... and encourage[ ] the participation of additional family members ...." *Id.* The Court finds that this likely falls under § 1396d(a)(19) (case management services). As another example, the second component service of wraparound services is "Immediate Crisis Stabilization." *Id.* at 2–3. A subcomponent of that service is "to address safety issues related to medical needs, severe psychiatric symptoms, behaviors of a child that might place others in jeopardy, or issues related to a child living in an unsafe environment." *Id.* at 3. The Court finds that, depending on the circumstances and severity of the crisis, these activities likely fall under § 1396d(a)(5)(A) (physician services),

§ 1396d(a)(2)(A) (outpatient hospital services), § 1396d(a)(9) (clinic services), § 1396d(a)(7) (home health care services), or § 1396d(a)(13) (rehabilitative services).

Each component service of therapeutic foster care similarly falls within one or more categories of § 1396d(a). For example, "Recruitment and Matching," which includes "the recruitment of families to serve as therapeutic foster parents, and then matching those families with children in need of a therapeutic foster home," *See* Appendix B at 2, likely falls under § 1396d(a)(19) (case management services).

**13.** These exclusions are not applicable here since Plaintiffs do not seek to compel California to provide them.

**14.** Arkansas, Delaware, Florida, Georgia, Kansas, Kentucky, Michigan, Minnesota, Montana, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, South Carolina, and Wyoming. *Id.* ¶ 19 n. 2.

System.'" *Id.* ¶ 19. Arizona also funds its wraparound services program with Medicaid dollars. *Id.* ¶¶ 4, 27–30. The Medicaid-covered components of Arizona's therapeutic foster care program includes "group rehabilitative treatment, individual and family therapy, substance abuse/chemical dependency therapy, basic living skills redevelopment, social skills redevelopment and crisis/behavior management." *Id.* ¶ 25. The Medicaid-covered components of its wraparound program include the engagement of the child and family; immediate crisis stabilization; strengths, needs and cultural discovery; formation of the child and family team; development and implementation of the behavioral health plan; on-going crisis and safety planning; tracking and adapting; and transition out of the formal wraparound program. *Id.* ¶ 29. Dr. Redman's detailed description of Arizona's state-wide program is corroborated and supplemented by Timothy Penrod, formerly a State of Arizona Child Protection Services Specialist and now the CEO of a firm providing those kinds of services to children and families in Arizona. Penrod Decl. ¶¶ 1–26.

Nebraska has used Medicaid funds to provide wraparound services, Koyanagi Decl. ¶ 27, although the parties debate the extent to which Medicaid dollars now contribute to that program. Koyanagi Supplemental Decl. ¶ 3b; Defs.' Ex. 107.

Pennsylvania's wraparound services are "funded by Pennsylvania's Medicaid program, as part of its EPSDT benefit." Nace Decl. ¶¶ 30–31.

In Milwaukee, Wisconsin, Medicaid funding is used for "Wraparound Milwaukee" to cover "case management, team meetings, mobile crisis intervention, psychiatric and psychological assessments, crisis stabilization teams, medical day treatment, medication management, in-home therapy, office-based therapy, group thera-

py, substance abuse treatment, and a comprehensive provider system." Kamradt Decl. ¶ 18. Only "[n]on-medically necessary services—like tutors and mentors—are not covered . . . ." *Id.*

Even the State Defendants' own expert, Mary Jean Duckett, of the United States Department of Health and Human Services, acknowledges that "[s]ome states have included in their approved state plans, coverage for services under the label of therapeutic foster care that [the federal Center for Medicare and Medicaid Services] believed to consist of component parts that are Medicaid-covered care and services within the scope of the definitions listed in 42 U.S.C. § 1396d(a)." Duckett Decl. ¶ 5.

■ Not only do wraparound services and therapeutic foster care fall within the scope of Medicaid-mandated ESPDT services, but they may be "medically necessary" within the meaning of the statute. The Medicaid Act does not define when a service is "medically necessary." Rather, the decision "rests with the individual recipient's physician and not with clerical personnel or government officials." *Pinneke v. Preisser,* 623 F.2d 546, 550 (8th Cir.1980); *Weaver v. Reagen,* 886 F.2d 194, 200 (8th Cir.1989) ("The Medicaid statute and regulatory scheme create a presumption in favor of the medical judgment of the attending physician in determining the medical necessity of treatment."). Plaintiffs have proffered the declarations of numerous behavioral and mental health experts who attest to the medical necessity of providing these services to foster care children with emotional disturbances. Thus, Ira Lourie, a former psychiatrist at the National Institute for Mental Health for over two decades and currently Assistant Clinical Professor of Child Psychiatry at Georgetown University School of Medicine, states that

"wraparound services are medically necessary for children with serious mental health needs." Lourie Decl. ¶ 2. Dr. Lourie adds that "wraparound programs enable children with behavioral, psychiatric, or emotional impairments to function as well and as normally as possible." Lourie Decl. ¶ 13. Dr. Patricia Chamberlain, an Oregon-based psychologist who developed a therapeutic foster care program lauded by the federal government, states that "a children's mental health system that does not include Therapeutic Foster Care ... as an available intervention is incomplete and inadequate because intense mental health interventions, provided in home-like settings are necessary for many children with serious behavioral or mental health needs." Chamberlain Decl. ¶ 3. Dr. Eric Bruns, a psychologist and Assistant Professor at the University of Washington School of Medicine, states that "[a]long with therapeutic foster care, ... wraparound is generally cited among ·the most effective integrated community-based interventions for children with emotional, behavioral, and mental health disorders. As such, both therapeutic foster care and wraparound are integral parts of any modern children's mental health system." Bruns Decl. ¶ 3. Dr. Charles Huffine, a psychiatrist who served as President of the American Association of Community Psychiatrists, states that wraparound services "are essential mental health services and medically necessary for some children with mental health needs." Huffine Decl. ¶ 7.

Dr. Robert Friedman, the Chair of the Department of Child and Family Studies at the University of South Florida, states that "[t]herapeutic foster care is an evidence-based practice, the gold standard in mental health interventions for youth .... [T]here are sufficient findings to consider wraparound services a research validated evidence-based practice." Friedman Decl. ¶ 4. He adds that "a functioning children's mental health system would include both therapeutic foster and wraparound care services. Both services are necessary for some children with serious emotional disturbance, many of whom are in the foster care system." *Id.* ¶ 5. Friedman also notes that "wraparound services and therapeutic foster care are widely thought of as essential to any modern children's mental health system ...." *Id.* ¶ 31.

The State Defendants have not presented any declarations by mental health experts contesting this evidence that wraparound services and therapeutic foster care are medically necessary services for foster care children with mental health care needs.[15]

For all the foregoing reasons, the Court concludes that Plaintiffs have demonstrated a strong likelihood of succeeding on the merits of their substantive claims concerning the Medicaid Act and EPSDT.

■ Plaintiffs contend that the balance of hardships tips in their favor because absent an order requiring the State of

---

**15.** In reference to the wraparound services provided via California's Title IV–E Waiver Child Demonstration Project, the State Defendants do contend that "a federally required independent evaluation of the project showed that the project did not demonstrate that provision of wraparound services was any more effective than traditional services." (citing Treadwell Decl. ¶ 11). This is misleading. Treadwell went on to state that "[t]he evalua-tion ... concluded that one of the likely reasons that there was no statistically significant positive effect shown for the group of children receiving wraparound services was that the [participating] 'counties were more successful at providing Wraparound-like services to the comparison [*i.e.,* control] group than the evaluation was able [to] assess, resulting in similar outcomes between the groups.'" Treadwell Decl. ¶ 11.

California to provide wraparound services and therapeutic foster care, those foster children with mental health needs would likely face unnecessary institutionalization. The State Defendants' one paragraph opposition on this point argues (1) that Plaintiffs cannot be suffering irreparable injury given that they waited three years since initiating this suit to file the present motion and (2) that Plaintiffs have an adequate remedy via the Medicaid appeals process. As to the first argument, Plaintiffs initially focused much of their efforts and limited resources on their claims against Los Angeles County, which led to a pioneering, albeit still problem-laden, settlement. The County agreed to ensure that members of the countywide subclass "promptly receive necessary, individualized mental health services in their home ... or the most homelike setting appropriate to their needs; receive the care and services needed to prevent removal from their families ...; be afforded stability in their placements ...; and receive care and services consistent with good child welfare and mental health practice and the requirements of state and federal law." Katie A. Advisory Panel's Fifth Report to the Court, June 16, 2005, at 3. As to the remaining members of the statewide class, the unmet mental health needs and the harms of unnecessary institutionalization are no less grave now than three years ago.

Defendants' argument that the Medicaid appeals process undermines the showing of irreparable injury is also unpersuasive. "[E]xhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983." *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 516, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982).

### III. *CONCLUSION*

The Court GRANTS Plaintiffs' motion for preliminary injunction.[16] The component services of wraparound services and therapeutic foster care identified in Plaintiffs' supplemental interrogatory responses likely fall within the EPSDT provisions of the Medicaid Act. Therefore, California must screen members of the statewide class and provide wraparound services and therapeutic foster care where medically necessary "to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services." 42 U.S.C. § 1396d(r)(5).[17]

Accordingly, during the pendency of this lawsuit, Defendant Sandra Shewry, in her official capacity as Director of the California Department of Health Services, and Defendant Dennis Boyle, in his official capacity as Director of the California Department of Social Services, as well as their respective successors in office, agents, servants, employees, and all others

---

**16.** Docket No. 315.

**17.** Given this conclusion, it is unnecessary to address Plaintiffs' alternative claims that they are entitled to the same relief under the Americans with Disabilities Act and the Rehabilitation Act. Similarly irrelevant is the State Defendants' contention that Title IV–E of the Social Security Act, which is the primary funding mechanism for children who have already been placed in foster care, does not permit payment for social services for the child or the child's family when the child has not yet been removed from the home. Plain-

tiffs do not claim that the State of California must pay for wraparound and therapeutic foster care using Title IV–E funds (although Title IV–E funds may, indeed, cover certain component services of wraparound services and therapeutic foster care). Rather, Plaintiffs claim that the Medicaid Act's independent funding provision, namely, Title XIX of the Social Security Act, will likely help cover those services. Thus, any restrictions on the use of Title IV–E funds are not relevant to Plaintiffs' Medicaid-based argument.

acting in concert with them, shall provide wraparound services and therapeutic foster care, as defined in Appendices A and B. Such forms of treatment shall be provided to class members on a consistent, statewide basis through the Medi–Cal program or other means, beginning not later than 120 days from entry of this Order. (The plan need not necessarily include *all* of the aspects of wraparound services and therapeutic foster care specified in Appendices A and B.) In order to effectuate this requirement, counsel for the State Defendants and for Plaintiffs shall meet and confer and develop a plan for implementing this preliminary injunction. Among other things, the plan must identify the responsibilities of the different State agencies, the need for additional providers, the eligibility criteria for wraparound services and therapeutic foster care, methods and procedures to inform class members of the availability of these services, and a timeline for accomplishing needed tasks. In negotiating the plan, counsel shall diligently and in good faith take into account and apply this Court's previous rulings and observations in this case and in *Emily Q.*

Furthermore, the State Defendants and Plaintiffs shall also meet and confer as to whether the Court should appoint a Special Master. (If the Court does so, the individual may well be the same person who may be appointed Special Master in *Emily Q.*)

Not later than 70 days from entry of this Order, the State Defendants and Plaintiffs shall file a joint status report regarding the status of an implementation plan and the possible appointment of a Special Master.

Because this action is brought by a class of indigent Plaintiffs, the Court chooses to exercise its discretion by not requiring the posting of a bond. *People of Cal. ex rel.*

*Van De Kamp v. Tahoe Reg'l Planning Agency,* 766 F.2d 1319, 1325 (9th Cir.1985).

IT IS SO ORDERED.