# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-1668

_____

| | | |
|---|---|---|
| Pediatric Specialty Care, Inc.; | * | |
| Child & Youth Pediatric Day Clinics, | * | |
| Inc.; Family Counseling & | * | |
| Diagnostic Clinic; Tomorrow's | * | |
| Child Learning Center, LLC; D&D | * | |
| Family Enterprises, Inc.; James | * | |
| Swindle; Stacey Swindle, as parents | * | |
| and next best friends of Jacob and | * | |
| Noah Swindle, Minors; Susann | * | |
| Crespino, as parent and next best | * | |
| friend of Michael Crespino, a minor; | * | |
| | * | |
| Plaintiffs-Appellees, | * | |
| | * | Appeal From the United States |
| v. | * | District Court for the |
| | * | Eastern District of Arkansas. |
| Arkansas Department of Human | * | |
| Services; | * | |
| | * | |
| Defendant-Appellant, | * | |
| | * | |
| Kurt Knickrehm, in his individual | * | |
| capacity and in his official capacity | * | |
| as Director of the Arkansas | * | |
| Department of Human Services; | * | |
| | * | |
| Defendant, | * | |
| | * | |
| Ray Hanley, in his individual | * | |
| capacity as Director of the Division | * | |
| of Medical Services of The Arkansas | * | |

Department of Human Services;          *
                                       *
          Defendant-Appellant,         *
                                       *
Arkansas Foundation for Medical        *
Care;                                  *
                                       *
          Defendant,                   *
                                       *
Roy Jeffus, in his official capacity   *
as Interim Director of Arkansas        *
Department of Human Services           *
Division of Medical Services;          *
                                       *
          Defendant-Appellant.         *


_____


Submitted:  February 15, 2006
    Filed:    April 17, 2006

_____


Before SMITH, HEANEY, and BENTON, Circuit Judges.

_____


HEANEY, Circuit Judge.

       This case, which involves disputes about the medical services that Arkansas provides to needy children, returns to this court following two prior appeals and remands for further proceedings.  In its first appeal, the Arkansas Department of Human Services (ADHS) challenged a district court injunction that forced it to keep its Child Health Management Services (CHMS) program as part of its state Medicaid plan.  We held that, pursuant to the Medicaid Act, children had an enforceable right to early and periodic screening, diagnosis, and treatment (EPSDT) services. Pediatric Specialty Care, Inc. v. Ark. Dep't of Human Servs., 293 F.3d 472, 478-79 (8th Cir.

-2-

2002) (hereinafter Pediatric I). We reversed the injunction, however, to the extent that it required ADHS to continue the CHMS program as part of its state plan. Id. at 480. So long as the state continued to pay for CHMS-type services when prescribed by a doctor, we reasoned, the state fulfilled its obligations under the Medicaid Act. Id. at 480-81. We then remanded for further proceedings.

On remand, the district court considered the plaintiffs' procedural and substantive due process claims. The district court held that ADHS violated the procedural due process rights of the plaintiffs by attempting to change the CHMS program without first conducting a study about the effect such a change would have on the efficiency, economy, quality of care, and access to care, as required by 42 U.S.C. § 1396a(a)(30)(A). It further held that ADHS had engaged in "conscience shocking" behavior by trying to reduce medical services to needy children based on political and fiscal motivations. On appeal, we affirmed the district court's ruling on the plaintiffs' procedural due process claim. Pediatric Specialty Care, Inc. v. Ark. Dep't of Human Servs., 364 F.3d 925, 929-31 (8th Cir. 2004) (hereinafter Pediatric II). As to the substantive due process claim, however, we held that ADHS's attempt to move CHMS services "off-plan" for cost savings was not conscience shocking, and thus reversed the district court's contrary holding. Id. at 932. We again remanded for further proceedings.

On remand, the district court considered, among other things, damages claims against Kurt Knickrehm, Ray Hanley, and Roy Jeffus, all current or past high-level supervisors of ADHS.[1] Knickrehm, Hanley, and Jeffus moved for summary judgment, asserting they were entitled to qualified immunity. ADHS contended that it was entitled to absolute immunity under the Eleventh Amendment because it was

---

[1]Knickrehm has been director of ADHS since January of 1999; Hanley was director of the Division of Medical Services of ADHS from 1994 through January 6, 2003; Jeffus has been director of the Division of Medical Services from January 6, 2003 to the present.

an agency of the state of Arkansas. The district court granted the motion as to Knickrehm, but denied it as to Hanley and Jeffus. Although its order expressly disposed of all of the defendants' other summary judgment claims, it was silent regarding ADHS's Eleventh Amendment argument.

On appeal, Hanley and Jeffus contend that the district court erred in denying their claim for summary judgment based on qualified immunity. ADHS argues that the district court erred in failing to grant it summary judgment based on Eleventh Amendment immunity. We find no error in the district court's conclusion that Hanley and Jeffus are not entitled to summary judgment on this basis. On ADHS's Eleventh Amendment claim, we agree that it must be dismissed from the suit as an agency of the state. Our review of the record, however, indicates that the plaintiffs have sought prospective injunctive relief from ADHS by suing its directors, and ADHS has admitted that its officials can be sued for the purpose of seeking prospective injunctions. Thus, we affirm in part, but direct the district court on remand to dismiss ADHS from the suit.

## BACKGROUND

Much of the background of this dispute has been recounted in our prior opinions of Pediatric I and Pediatric II, and will not be fully restated here. The plaintiffs include medical clinics that provide EPSDT services to special needs children in Arkansas and recipients of those services. The services are provided for the purpose of increasing the functional levels of developmentally impaired children. These services have been offered in Arkansas through the CHMS model, which "extends diagnostic and evaluative services, pediatric day treatment, and various therapies to children from six months to six years of age." Pediatric II, 364 F.3d at 928.

Over the past several years, ADHS has tried to curtail its payments for CHMS services. In November of 2001, ADHS issued a press release stating that it would restructure the CHMS program, terminating day treatment and therapeutic programs, resulting in a savings of several million dollars. As relevant to this appeal, the plaintiffs have alleged[2] that Hanley, Jeffus, and the ADHS employed a system requiring prior authorization for CHMS services solely for budget-related reasons without consideration of the medical necessity of the services.

The prior authorization regime was operated by Arkansas Foundation for Medical Care (AFMC), an independent organization that contracted to provide this service to ADHS. Beginning in July of 2001,[3] AFMC was presented with applications for CHMS services, and was tasked with determining whether the requested services were medically necessary based on a review of the child's medical records. First, a nurse reviewer received a CHMS provider's request for prior authorization. If the nurse reviewer did not approve the plan, it was sent to a physician reviewer. If the physician reviewer denied the services, the provider could ask for reconsideration, and the plan would be reviewed by a second physician. Nurse reviewers may not override a doctor's decision to recommend services.

At some point while Hanley was director, he changed the prior authorization process so that the AFMC would review not only whether the service requested was of a medically necessary type, but also inquire as to the medically necessary amount of the service. This essentially led to a wholesale reduction in CHMS services from six hours per day, per child to no more than three and one-half to four hours per day, per child.

---

[2]These allegations were made through an amended complaint that was filed after the appeal in Pediatrics II was already pending.

[3]ADHS entered into two contracts with AFMC, one extending from July 1, 2001 through June 30, 2003, and another from July 1, 2003 through June 30, 2005.

The plaintiffs presented evidence from their expert, Dr. Sharon Ramey. Dr. Ramey testified that six hours per day of services is most effective for needy children. The district court believed that Dr. Ramey's testimony, taken in the light most favorable to the plaintiffs, raised an inference that the prior authorization procedure's reduction in CHMS services was based on considerations other than the medical necessity of the children.

Dr. John Whitaker was a doctor reviewer who worked for AFMC. He testified that AFMC used guidelines that only permitted nurses to approve up to three and one-half hours of CHMS services for children. He stated that he would not generally approve six hours of CHMS services for a child because, in his view, a child could not be expected to get beneficial results for more than four hours per day of a CHMS program. He further testified that, at the request of nurse supervisor Amy Carson, he had developed what he termed "rote denials" or "canned denials," which were pre-scripted denial letters[4] that nurses were supposed to use for certain types of claims that were easily disposed of.

According to Dr. Whitaker, it came to his attention in December of 2003 that one of AFMC's nurse reviewers, Tilerra Coats, was reducing CHMS services far greater than she should have been, and misusing his denial codes. Whitaker began to institute quality control on Coats's work, randomly checking the entire file in which she would recommend reduced services. On each occasion, Dr. Whitaker subsequently approved the child for more care than Coats had. In some instances, despite Dr. Whitaker's direction, the ultimate decision was not changed, and the child would receive less care than Dr. Whitaker had authorized. Dr. Whitaker also discovered that Coats was often altering his approvals to provide less service to the

---

[4]Dr. Whitaker clarified in his deposition that although they termed these denial letters, they were actually partial approvals of services, but in an amount or to a degree less than requested.

children. Dr. Whitaker brought this problem to the attention of Carson, Coats's supervisor, but nothing was done to correct matters. In fact, when Dr. Whitaker audited some of his past charts, he noticed that Carson had actually signed off on charts that Coats had altered. On further inquiry, Carson had written on a number of these files what she believed was the rationale for the files not accurately reflecting the services approved by Dr. Whitaker. Most often her explanation was merely her own opinion stating that she did not believe the services were necessary, or supporting Coats's opinion to that effect. Neither Coats, Carson, nor any other nurse, however, is permitted to change a physician's recommendations for CHMS services. Dr. Whitaker also discovered that some of his charts had been altered in a manner that made the children under review appear not to qualify for either the extent or degree of services he approved. When Dr. Whitaker sought an explanation for this, written notes on at least one of his charts indicated that his authorized service was not given because "the directive I[5] received from [ADHS] was to only approve 1 unit of 99211[6] per day." (Whitaker Dep. at 77.)

Dr. Whitaker was also informed that Coats was re-reviewing other nurses' work, and would often change the recommendations to approve fewer services for the children. In these instances, Coats would typically erase the prior nurse's review so that it looked like hers was the only review. Dr. Whitaker was not aware of any instance in which a nurse reviewer, either intentionally or mistakenly, increased the amount of services approved over what a physician had recommended. Dr. Whitaker eventually reported this wrongdoing to Dr. Susan Keathley, who brought it to the attention of Dr. Moody, the medical director for AFMC.

---

[5]It is unclear from the deposition if the "I" in this sentence is Coats or Carson.

[6]99211 is a procedure code used for CHMS services. It refers to an office visit of an established patient for some reason. One unit is five minutes. In this instance, Dr. Whitaker had approved 40 units per month for a child's catheterization needs, but that had been reduced by a nurse to 20 units per month.

Brenda Gassaway is a registered nurse who was formerly employed as a nurse reviewer by AFMC. She began working for AFMC on April 10, 2000, and was fired on July 19, 2004. Gassaway stated that she knew about the problem of Coats changing doctors' files as early as January of 2002. Gassaway had been passing on this information to her supervisor, Carson, for a year and a half. Carson told Gassaway that they would have to handle matters carefully because Coats and Kenya Harbin, director of the review department, were close friends.

In early July of 2004, Gassaway was called into a meeting with Harbin and Susie Moore, the director of human resources. The meeting concerned Dr. Whitaker's claims of nurse wrongdoing. According to Gassaway, Dr. Moody sent the matter back to Harbin for investigation, and she then interviewed each of the nurse reviewers to determine who had helped Whitaker discover the altered files. Gassaway denied involvement, but told Harbin that she knew Coats was altering doctors' decisions. Harbin responded that they had reviewed the matter and found those allegations unsubstantiated. At that point, Gassaway concluded that the sole purpose of the meeting was to determine if Dr. Whitaker had acted inappropriately in auditing Coats's work and if anyone had helped him. Eventually, Harbin accused Gassaway of copying charts for Dr. Whitaker, which Gassaway continued to deny. As the meeting concluded, Gassaway again told Harbin to correct AFMC's wrongdoings. Harbin's response was to tell Gassaway not to discuss the meeting with anyone else.[7] Gassaway was fired a week later for insubordination and failure to follow the chain of command.

---

[7]Similarly, Brenda Gassaway testified in her deposition that she told Michael Rainwater, attorney for AFMC, about AFMC's canned-denial procedure, and he instructed her "don't bring it up" at her deposition. (Gassaway Dep. at 18.) Breck Hopkins, attorney for ADHS, was also present.

When asked at his deposition about how AFMC interacts with CHMS providers, Dr. Moody stated that AFMC regularly puts out memos to assist CHMS providers in knowing what kind of documentation is required. Gassaway disagreed:

No, that was not the truth. The truth is no matter what [CHMS providers] ask for you don't give it to them ever until they beg for it, and then you show up with someone who doesn't know so that you can say, "The person you need is not here." That's the truth.

(Gassaway Dep. at 22.)

Gassaway believed that Coats was not only changing doctors' charts, but also altering other nurses' work to reduce approved services. When asked what might motivate Coats to alter doctors' and nurses' files, Gassaway stated, "[b]ecause she's crazy." (Id. at 27.) She elaborated that Coats had stated that she did not think that any child deserved any services whatsoever, and that the CHMS program was just expensive daycare. When asked again what incentive Coats had to illegally reduce the services, Gassaway speculated that it was because of the cost savings attributable to AFMC's reviews. Gassaway stated that both Carson (her direct supervisor) and Harbin (an AFMC vice president) had stated that AFMC's cost-savings reports, which were reports generated and published to ADHS about the amount of money AFMC had saved ADHS through the review process, justified ADHS renewing AFMC's contract. Gassaway termed this as the general sentiment at AFMC, which every employee is aware of. As she stated, "I worked there for four years and I saw the patterns of how the programs are worked and it just seems that the goal is always to cut services and to make [CHMS] centers jump through hoops to get the kids approved so that they'll just quit." (Id. at 36.) She also testified that she received written and oral directives from Carson, which Carson had in turn received from Shirley Wilson, a former director of ADHS, that they should generally deny certain requests for services, such as those requested for children with only a single disability.

Based in large part upon the deposition testimony of Gassaway and Dr. Whitaker, the district court determined that individual defendants Hanley and Jeffus were not entitled to qualified immunity. The court noted that the plaintiffs sought damages for the violation of clearly established rights to Medicaid services. As to whether the evidence supported the inference that such a violation occurred, the court stated

> Plaintiffs alleged and have offered sufficient evidence that a second layer of the prior authorization process was implemented by the individual capacity defendants resulting in an across-the-board reduction in the scope and duration of day treatment recommended by the CHMS providers. Consequently, all medicaid eligible children were allegedly denied their full array of recommended treatment. Plaintiffs contend that this reduction has violated the equal access provision of the Medicaid Act as well as entitlement to day treatment in accordance with [42 U.S.C.] § 1396d(a)(13). There is sufficient evidence in the record [to] raise a reasonable inference that the conduct of Defendants reduced the quality of care available to low income children as compared to other children in the general population. Moreover, there is sufficient evidence that costs for the additional hours of care may be borne by the CHMS providers to such an extent that it jeopardizes the future availability of their services. Finally, according to Ms. Gassaway, elimination of such services is the goal of the prior authorization practices engaged in by AFMC with the encouragement and tacit approval of Defendants.

(Dist. Ct. Order of Feb. 7, 2005 at 34-35.)

The court did not specifically rule on the issue of whether ADHS, as an agency of the state, was entitled to summary judgment on the basis of Eleventh Amendment immunity. This interlocutory appeal by Hanley, Jeffus, and ADHS followed.

-10-

## ANALYSIS

## I.    QUALIFIED IMMUNITY OF HANLEY AND JEFFUS.

"Ordinarily, a party cannot appeal from a denial of summary judgment." Pool v. Sebastian County, Arkansas, 418 F.3d 934, 937 (8th Cir. 2005). There is an exception to this rule for government officials whose motion for summary judgment based on qualified immunity is denied. Id. Under this exception, we may immediately review the issue of whether the defendants engaged in conduct that violated the plaintiffs' clearly established rights. Id.; see also Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (holding that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known").

We must first consider whether the Medicaid Act confers any federally enforceable rights upon the plaintiffs. This question has been largely answered by our prior opinions in this case. The claims for damages made by the plaintiffs here relate only to two subsections of the Medicaid Act: 42 U.S.C. § 1396d(a)(13) (Count Four of the Complaint), and 42 U.S.C. § 1396a(a)(30)(A) (Count Three of the Complaint). In Pediatrics I and Pediatrics II, respectively, we specifically held that each of these subsections created enforceable federal rights. Pediatrics I, 293 F.3d at 480-81 (holding that § 1396d(a)(13) created enforceable rights for recipient beneficiaries, which CHMS providers could assert on behalf of the beneficiaries); Pediatrics II, 364 F.3d at 930 ("Over ten years ago, our court held that § 1396a(a)(30)(A) created enforceable rights for Medicaid recipients and providers. We find it entirely appropriate for the Plaintiffs to base their procedural due process claim on their clearly established rights to have equal access to quality medical care as defined by § 1396a(a)(30)(A)." (Citation omitted)). Thus, the argument that there

is no federally enforceable rights here is at odds with both the law of the case doctrine and the principle of stare decisis.[8]

"The law of the case doctrine prevents the relitigation of a settled issue in a case and requires courts to adhere to decisions made in earlier proceedings," except where the result would be manifestly unjust. Kan. Pub. Employees Ret. Sys. v. Blackwell, Sanders, Matheny, Weary & Lombardi, L.C., 114 F.3d 679, 687 (8th Cir. 1997). Stated another way, when our court considers a case on appeal, every issue disposed of on appeal has thus been finally decided. Klein v. Arkoma Prod. Co., 73 F.3d 779, 784 (8th Cir. 1996). The doctrine is intended to "'insure uniformity of decisions, protect the expectations of the parties and promote judicial economy.'" In re Just Brakes Corp. Sys., Inc., 293 F.3d 1069, 1072 (8th Cir. 2002) (quoting Klein, 73 F.3d at 784). The doctrine does not apply, however, where an intervening decision of a higher tribunal clearly demonstrates that the prior decision is wrong. Madison v. IBP, Inc., 330 F.3d 1051, 1059 (8th Cir. 2003).

42 U.S.C. § 1396d(a)(13) entitles Medicaid eligible children to

> diagnostic, screening, preventive, and rehabilitative services, including any medical or remedial services (provided in a facility, a home, or other setting) recommended by a physician or other licensed practitioner of the healing arts within the scope of their practice under State law, for the maximum reduction of physical or mental disability and restoration of an individual to the best possible functional level.

---

[8]Under the doctrine of stare decisis, one panel may not overrule an earlier decision of the court. United States v. Mosby, 101 F.3d 1278, 1279 n.3 (8th Cir. 1996). Because the analysis of the stare decisis issue on this matter is rendered unnecessary by operation of the law of the case doctrine, we have not separately addressed it. See id.

In Pediatrics I, we affirmed the district court's holding that this subsection of the Medicaid Act created an enforceable federal right to early intervention day treatment when recommended by a physician. Pediatrics I, 293 F.3d at 477-78. No petition for rehearing was filed by the ADHS. Cf. Klein, 73 F.3d at 784 n.7 ("Generally, parties must bring any perceived errors in a panel opinion to the court's attention through a petition for rehearing.")

Similarly, 42 U.S.C. § 1396a(a)(30)(A), commonly referred to as the "equal access provision" of the Medicaid Act, requires state Medicaid plans to employ methods and procedures related to use and payment of care and services as necessary to ensure that the state's payments are "consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." Relying in part on our earlier opinion in Arkansas Medical Society, Inc. v. Reynolds, 6 F.3d 519 (8th Cir. 1993), we held that this part of the Medicaid Act created a clearly established federal right to equal access to quality medical care. Pediatrics II, 364 F.3d at 930. ADHS petitioned for rehearing en banc from this decision, but nowhere in the petition did ADHS suggest that it was error to find that the equal access provision created an enforceable federal right.

Given our clear prior panel holdings, the question of whether §§ 1396d(a)(13) and 1396a(a)(30)(a) confer enforceable federal rights upon the plaintiffs appears settled in the affirmative. Although ADHS suggests that Pediatrics I did not finally answer whether CHMS providers had an enforceable right under § 1396d(a)(13), we explicitly stated that the providers have "standing to assert the rights of their CHMS patients." 293 F.3d at 478. Thus, there is little merit to that argument.

ADHS invites us to overturn our prior decisions based on the view that they are inconsistent with the Supreme Court's decision in Gonzaga University v. Doe, 536

-13-

U.S. 273 (2002). According to ADHS, Gonzaga clarified that an enforceable right is only created where the statute explicitly states as much, and is only enforceable by the person or entity that the statute states is the beneficiary.

At the outset, we note that Gonzaga was issued on June 20, 2002. Our decision in Pediatrics I was filed ten days earlier, but the mandate did not issue until July 1, 2002, with no petition for rehearing before that time. See Fed. R. App. P. 40(a) (granting a party fourteen days from the entry of judgment to file a petition for rehearing). Likewise, our decision in Pediatrics II was not issued until April 16, 2004. Thus, Gonzaga is not an intervening decision of a superior tribunal, as is required before we may overturn matters previously settled as the law of the case. Madison, 330 F.3d at 1059.

Perhaps more importantly, we do not read Gonzaga to require a different result than we reached in our earlier decisions. In Gonzaga, the question presented was whether a student could bring a damages claim pursuant to 42 U.S.C. § 1983 for a University's violation of the Family Educational Rights and Privacy Act of 1974 (FERPA). 536 U.S. at 276. FERPA was enacted pursuant to Congress's spending power, and directed the Secretary of Education to withhold funds from institutions that released students' private information without their consent. Id. at 278. A student at Gonzaga's school of education sued the school under FERPA when he found out that the school's teacher certification specialist disclosed allegations of sexual misconduct to Washington's teacher certification agency without his permission. Id. at 277.

Writing for the majority, Chief Justice Rehnquist first recognized that there was some circuit and district court discord and confusion about what type of statutory rights were enforceable by a § 1983 damages action. Id. at 278. The Court noted that the starting point must be an inquiry into whether Congress intended to create a federal right. Id. To determine this, one must consider the benefit conferred by the

-14-

statute, the intended beneficiary, and whether the statute provides for some type of enforcement action short of a private cause of action. Id. at 285-90. The Court stated that the creation of such rights must be done "in clear and unambiguous terms." Id. at 290. The Court ultimately held that FERPA provisions failed to create privately enforceable rights, since it had no explicit "rights-creating language," spoke in terms of aggregate as opposed to individual privacy protections, and directed the Secretary of Education to enforce it. Id.

ADHS would have us read Gonzaga in a manner that forecloses private causes of action based on the Medicaid Act. However, an earlier case, Wilder v. Virginia Hospital Association, 496 U.S. 498 (1990), has already considered whether (now-repealed) provisions of the Medicaid Act, which required the state to reimburse hospitals for costs of certain services, conferred a § 1983 right of action on behalf of health care providers. The Court first held that "[t]here can be little doubt that health care providers are the intended beneficiaries" of the provision, since it was about payment of services provided by them. Id. at 510. The Court then concluded that the mandatory language of the provision–requiring some level of payment for the health care providers' services even though the ultimate amount was left mostly to the state's discretion–created an enforceable right to payment under § 1983. Id. at 512-13. Although Gonzaga takes a more restrictive view of rights-creating statutes, it did not overrule Wilder. Thus, the proposition that the Medicaid Act may create enforceable rights, even for health care providers, is far from novel.

Secondly, the plaintiffs still prevail within the terms of the Gonzaga analytical framework. As to § 1396d(a)(13), the statute calls for state payment of part or all of the costs of diagnostic, screening, preventive, and rehabilitative services when recommended by a doctor "for the maximum reduction of physical or mental disability and restoration of an individual to the best possible functional level." The intended beneficiaries of this subsection are, obviously, the needy child, and by corollary, those who incur costs in providing those services. Moreover, this portion

of the statute does not speak in terms of amorphous concepts; it requires therapeutic services for "an individual." Id. We acknowledge that the federal government is charged with responsibility for supervising a state's participation in the Medicaid program, a factor that Gonzaga holds indicative of no private right being created. This, however, cannot overcome the fact that the statute itself indicates positively both the scope of the provision and who is the intended beneficiary. Thus, a private cause of action lies for enforcement of § 1396d(a)(13).

Similarly, 42 U.S.C. § 1396a(a)(30)(A), is intended to benefit both CHMS recipients and providers, and creates enforceable rights for both groups. That subsection requires states to provide methods and procedures for payment of care and services in a manner that ensures equal access to quality care for needy children. Id. The beneficiaries are both the recipients of the services and the recipients of the state's payment, who are the CHMS providers. The statute is clear on its scope: to ensure payments are not too high, but yet high enough to secure the participation of enough clinics so that needy children receive equal access to quality health care.

In sum, as our prior cases have held, the rights conferred by §§ 1396d(a)(13) and 1396a(a)(30)(A) are clearly established federal rights. Moreover, even accepting ADHS's invitation to reconsider prior established precedent, we find no error in the district court's holding that these provisions of the Medicaid Act are enforceable by both CHMS recipients and providers through a § 1983 private cause of action.

We must now consider whether the evidence, viewed in the light most favorable to the plaintiffs, Plemmons v. Roberts, 439 F.3d 818, 822 (8th Cir. 2006), supports the view that Hanley and Jeffus violated the plaintiffs' Medicaid Act rights. The district court found that, taking all evidence and inferences in the plaintiffs' favor, they could show that Jeffus and Hanley manipulated the prior authorization system in a way that denied children essential medical services solely because they

wanted to cut costs. After carefully reviewing the record, we agree with the district court.

The evidence presented to the district court is recounted fully above, and will be merely summarized here. There is certainly evidence that documented AFMC's wrongdoing: Dr. Whitaker testified about how his approvals had been altered by a nurse, and Brenda Gassaway, a nurse, testified consistently with that. When brought to the attention of supervisors, nothing was done to correct this misconduct. To the contrary, Gassaway herself was fired.

The more difficult question is whether ADHS's directors can be tied to this wrongdoing. Although disputed and certainly not proven, the inference of wrongdoing is supported by the plaintiffs' evidence. Deposition testimony indicated that AFMC's primary concern was to save ADHS money, and Gassaway stated that her superiors told her that this was the reason they were able to maintain the contract with ADHS. In other words, AFMC won and kept the contract as ADHS's prior authorization agent because it would deny or reduce a significant number of claims when compared to the services paid prior to AFMC's arrival. There was also testimony that ADHS worked overtly to ensure that claims were denied by sending directives to AFMC about the extent of services that AFMC could approve. As recognized by the district court, Hanley and Jeffus "implemented a policy [of prior authorization] that reduced the scope and duration of day treatment for beneficiaries of the Medicaid Act." (Dist. Ct. Order of Feb. 7, 2005 at 38.) Taking the evidence in the plaintiffs' favor, one could infer that their primary motivation was to save money, although the statutes require them to act in the best interest of the needy children. That is a violation of the rights clearly established under the §§ 1396d(a)(13) and 396a(a)(30)(A) and our prior caselaw, and thus neither defendant is entitled to summary judgment on the issue of qualified immunity. The district court properly so held.

-17-

## II.    STATE IMMUNITY FROM SUIT

ADHS argues that it must be dismissed from this suit because it is an agency of the state, and thus enjoys Eleventh Amendment immunity from suits by private individuals.[9]  The Eleventh Amendment protects states and state agencies from suit by private citizens.  Doe v. Nebraska, 345 F.3d 593, 597 (8th Cir. 2003).  According to the doctrine of Ex Parte Young, 209 U.S. 123 (1908), however, state officials may still be sued for prospective injunctive relief without violating the Eleventh Amendment.  Heartland Acad. Cmty. Church v. Waddle, 427 F.3d 525, 530 (8th Cir. 2005).

In this case, ADHS has asserted Eleventh Amendment immunity as a branch of the state.  ADHS therefore claims that the district court erred in allowing damages claims to go forward against it.  The plaintiffs responded by stating that they were not suing ADHS for damages, only for prospective injunctive relief.  ADHS argues that it is nonetheless entitled to immunity because only state officials, as opposed to state agencies, can be sued for prospective injunctive relief.  While that is true, Allen, 5 F.3d at 1153 (affirming dismissal of a state agency on Eleventh Amendment grounds), the plaintiffs sued not only ADHS, but also Knickrehm and Jeffus in their official capacities as director of ADHS and director of the Division of Medical Services for ADHS, respectively.  To the extent the plaintiffs' claims are against ADHS, they must be dismissed, but claims against the directors in their official capacity are not barred by the Eleventh Amendment.

---

[9]The district court's order contains no ruling on this issue, raising a question of whether it is properly presented to us.  That said, we review Eleventh Amendment issues de novo, Allen v. Purkett, 5 F.3d 1151, 1153 (8th Cir. 1993) (per curiam), and neither party has raised a factual dispute related to this issue.  Particularly given the lengthy history of this case, which has yet to be tried on its merits, we see no use in returning this matter to the district court for a decision that we would again review with no deference.

## CONCLUSION

The current and former directors of the Arkansas Department of Human Services appeal the denial of qualified immunity on the plaintiffs' claims relating to their clearly established rights under the Medicaid Act. Because the evidence supports an inference that they violated the plaintiffs' clearly established rights to provide and receive medically necessary health care, we affirm the denial of summary judgment on that basis.

We agree that claims against ADHS, as an agency, must be dismissed on Eleventh Amendment grounds. Because the plaintiffs have also asserted claims seeking prospective injunctive relief against state officials, such claims are not barred by the Eleventh Amendment. Accordingly, we affirm in part, and remand with directions to dismiss ADHS from the suit.

_____