WHITNEY, District Judge,
concurring in the judgment in part and dissenting in part:
I concur in the result reached in Part III of the majority opinion, because at the very least Doe’s “freedom of choice” claim fails as a matter of law, notwithstanding additional doubts I have concerning whether such a claim is even justiciable. I respectfully dissent from the result reached in Part II of the majority opinion, and instead would find Doe’s “reasonable promptness” claim to be moot, or would affirm the district court on the alternative basis that Doe has no private right of action under 42 U.S.C. § 1983.
I.
Doe’s principal claim on appeal centers around the question of whether the State’s decision to provide her with “respite” services in a qualified CTH II group home (instead of “residential habilitation” services in a similar type of setting) comports with the requirement that it furnish “assistance” to “eligible individuals” with “reasonable promptness.” 42 U.S.C. § 1396a(a)(8). In order to ensure that there is a live case or controversy for the district court to resolve on remand, I would need to be satisfied of two things: first, that Doe is “eligible” to receive the type of “assistance” she seeks to be provided; and second, that Doe is receiving, or at risk of receiving, a level of “assistance” that does not meet the level of “assistance” to which she is entitled by law. Because neither of these conditions can now be satisfied, I would hold that Doe lacks standing to prosecute her “reasonable promptness” claim and consequently would find that claim to be moot.
*361 A.
To place this issue in proper context, four foundational principles must be laid at the outset of the analysis. First is the principle that Doe’s' asserted “right” to have certain Medicaid services furnished with reasonable promptness is wholly contingent on Doe being deemed eligible for and in need of those services. See 42 U.S.C. § 1396a(a)(8) (“[A]ssistance shall be furnished with reasonable promptness to all eligible individuals.” (emphasis added)).
Second is the related principle that Medicaid eligibility, once found to exist, does not give rise to a perpetual right to Medicaid-funded support. Doe’s level of services may be adjusted (and even terminated) to take into account bona fide changes in her needs or eligibility, provided that she is accorded due process prior to any adverse action. See 42 C.F.R. § 435.930(b) (“The agency must ... furnish Medicaid regularly to all eligible individuals until they are found to be ineligible.” (emphasis added)); 42 C.F.R. §§ 431.220, -.241 (providing for a fair hearing on the request of an aggrieved Medicaid recipient).
Third is the principle that the state not only has the right to consider how changed circumstances impact Doe’s eligibility, but that it also has an affirmative duty to conduct periodic reevaluations to that end. In order to facilitate an efficient allocation of scarce Medicaid resources to those individuals most critically in need, federal regulations require that states “redetermine the eligibility of Medicaid recipients, with respect to circumstances that may change, at least every 12 months.” 42 C.F.R. § 435.916(a). Likewise, with respect to services rendered under the Medicaid MD/RD Waiver program (in which Doe participated), South Carolina’s Waiver agreement with Health and Human Services obligates it to “provide for an evaluation (and periodic reevaluations, at least annually) of [a recipient’s] need for [an intermediate level of care].” (J.A. at 275.)
Last is the principle that sympathy or charity are not sufficient bases for a State to continue providing Medicaid to someone who does not satisfy the very stringent criteria for eligibility. Once a recipient is determined to be ineligible after being afforded a fair hearing, “the agency must ... discontinue services after the adverse decision.” 42 C.F.R. § 431.232(d) (emphasis added).
B.
With these four principles in mind, Doe’s personal story bears recounting. The State has never deemed Doe as meeting the criteria for mental retardation (J.A. at 264), and it has consistently treated with skepticism her claim of “related disability” based on her cerebral palsy and epilepsy (J.A. at 261). However, because she appeared to be experiencing “an acute exacerbation of her seizures which may not continue to be severe or lifelong,” DDSN left open the door to Doe’s provisional admission into the MR/RD Waiver program. (J.A. at 261.)
Also, around this time, Doe’s mother (who was her primary care giver) began experiencing psychiatric episodes that limited her ability to provide adequate care for Doe. (J.A. at 263.) Accordingly, DDSN began providing residential habilitation services to Doe in the form of in-home daytime health care and living assistance,[1] which were intended to ease the burden on Doe’s mother without uprooting Doe from *362 her family. (J.A. at 265.) This solution was also intended to comply with the State’s obligation to serve Doe in the least restrictive environment appropriate for her functional limitations. (J.A. at 210, 250.)
The mental health of Doe’s mother deteriorated significantly over subsequent months and DDSN officials determined that Doe was facing an “imminent risk” of losing her primary care giver due to incapacity. (J.A. at 267.) Accordingly, the . less restrictive environment of in-home care was no longer a viable option and the State promptly sought to make available out-of-home residential habilitation services in a CTH I (foster home) setting. (J.A. at 267.) This did not satisfy Doe and her family, however, who insisted that she be placed in an even more restrictive CTH II (group home) setting. Ultimately, the State capitulated to Doe’s demands and placed her on an interim basis in the New-berry CTH II facility, until the dispute over a suitable permanent placement could be sorted out.
Although Doe was receiving exactly the level of care she desired once she was moved to the Newberry CTH II facility in July 2003 (this being the reason that the district court dismissed Doe’s “reasonable promptness” claim as moot), the State chose to classify these services as “respite” rather than “residential habilitation.” Apparently, it is in the subtle distinction between “respite” and “residential habilitation” that the majority finds a live claim. However, unlike the majority, I find no basis to take issue with the State’s classification choice since, by the majority’s own definition, “respite” services are furnished “due to the regular care giver’s absence or need for relief,” supra note 3, which describes the very facts of this case giving rise to the decision to place Doe in a group home setting.
Moreover, I find no basis to take issue with the inherently “temporary” nature of these “respite” services, since the State should not have to impute upon itself a long-term obligation to keep Doe in a setting that it believes is more restrictive than necessary to meet her needs. Indeed, the majority correctly determines in Part III.B. that DDSN is not legally obligated to keep Doe in a CTH II facility simply because that is her preference, and is free to move Doe to a less restrictive setting more appropriate to her needs. Yet in Part II.B., the majority paradoxically finds that the State has not ceased its allegedly illegal conduct for the sole reason that Doe is “only in the Newberry CTH II for respite [services] or until her true status is determined.” (J.A. at 384.) The incongruity of these two conclusions could not be more manifest: How can Doe’s temporary placement in a CTH II facility until a more appropriate placement is identified be indicative of the State’s continuing failure to provide required Medicaid services with reasonable promptness, when at the same time we hold that permanent placement at a CTH II home is not required by law and that her permanent placement should be determined based upon her particular needs and eligibility status?[2]
*363 At the time of the district court’s judgment, the legal battle centered around whether Doe ultimately would be placed in a CTH II (group home) facility, in conformity with her wishes and those of her family, or whether she would be placed in a CTH I (foster home) setting, in conformity with the approved Plan of Care in effect at the time. (J.A. at 337, 348-49.) In order for there to have been a live controversy surrounding Doe’s “reasonable promptness” claim, at least one of these possible outcomes would have to result in the denial of her right to be furnished Medicaid services with reasonable promptness. The majority tells us today that the placement advocated by the State (CTH I) would not result in any impermissible denial of Medicaid services, since Doe has no legal right to self-determine her level of care and DDSN had determined that she was entitled to only a CTH I level of care. And the alternative placement (CTH II) would, in the words of her attorney, provide Doe with “the placement that we have requested” (J.A. at 338), even if, from DDSN’s perspective, such a placement is intended to be temporary or even wholly gratuitous. In other words, no matter what the outcome, Doe would have gotten either what she wanted or what she was entitled. Thus, nothing in the record upsets the district court’s finding that Doe’s “reasonable promptness” claim was moot.
C.
The district court’s dismissal of Doe’s “reasonable promptness” claim should not, therefore, be vacated simply on the fact that Doe was at risk of being displaced from a CTH II facility upon determination of her “true status.” However, the factual landscape has changed somewhat since the district court’s judgment. We now know that the State intends not only to remove Doe from a CTH II facility where she does not belong, but also now intends to discontinue her residential habilitation services altogether, because an investigation into her “true status” has confirmed that she does not meet the stringent eligibility criteria for ICF/MR intermediate level of care. Yet far from providing any additional support for Doe’s claim against the State for unreasonably delaying or withholding services, this turn of events squarely forecloses her claim, since standing to assert a “reasonable promptness” violation necessarily presupposes the recipient’s continuing eligibility for the services denied.
Here we pick up again where we last left off from Doe’s story. Doe’s 2003 Plan of Care (J.A. at 170-88) was in effect for a period of approximately one year, after which it was superseded by a new Plan of Care in May 2004 (J.A. at 113-15). This is consistent with the legal requirement, detailed above, that each recipient’s eligibility be reevaluated annually. Following the 2004 evaluation, Doe was approved for a consecutive year of eligibility for “residential habilitation” services (i.e., through Doe’s next level of care evaluation scheduled for early 2005).
Shortly thereafter, in or around June 2004, Doe’s care givers began to realize that Doe would frequently “initiate [ ] fake or pseudo seizure[s],” which they interpreted to be “manipulative behavior” that created “an unnecessary dependence on others.” (J.A. at 116.) This reasonably caused DDSN to question whether Doe might have “the capacity for a greater degree of independence,” (J.A. at 116), especially in light of the fact that a sudden “exacerbation” in the severity of her epilepsy was a primary factor in finding that Doe was medically qualified for residential *364 habilitation services under the Medicaid MR/RD Waiver program in the first place (J.A. at 261). This prompted DDSN to begin documenting Doe’s true seizure frequency and adaptive functioning abilities, which together suggested that her limitations were not so severe as to justify ICF/MR intermediate level of care. (J.A. at 299-300.)
Notwithstanding this new information, as well as a favorable judgment in the district court, DDSN allowed Doe to finish out the term of her May 2004 Plan of Care in a CTH II group home setting. However, in April 2005, following her annual level of care evaluation earlier that same year, Doe was notified by DDSN that she no longer satisfied the eligibility criteria for ICF/MR intermediate level of care, and that as a consequence her Medicaid MR/RD Waiver services would be terminated effective May 7, 2005, unless she timely requested a fair hearing, which she did. On June 5, 2006, following five days of hearings, a DHHS Hearing Officer upheld the determination of ineligibility in a thoughtful and comprehensive 34-page administrative order. (J.A. at 297-330.) That decision is now on appeal to the South Carolina Administrative Law Court, and the State is continuing to provide “respite” services until Doe has exhausted her appeals. (See Rule 28(j) filing dated August 6, 2007.)
The sequence of events just described must remove all doubt that, as of today, Doe’s “reasonable promptness” claim is moot, because she lacks any basis to assert that she is currently eligible to receive the particular services that she claims are being denied.[3] Doe’s theory of the case is built on the premise that her entitlement to residential habilitation services is contained within her March 2003 Plan of Care. However, that Plan of Care is no longer of any relevance because it was superseded by the May 2004 Plan of Care. And Doe cannot now point to the May 2004 Plan of Care as the source of her entitlement to residential habilitation services because that Plan of Care would have expired in May 2005, and her eligibility for these services has never been extended by a more current Plan of Care (for the reason, of course, that Doe has been found ineligible). The majority leaves me baffled as to how, upon remand, the district court should go about deciding whether Doe is now entitled to prospective relief[4] based on an alleged entitlement to services found in a Plan of Care that expired years ago, while turning a blind eye to the fact that recent state administrative proceedings have resulted in a determination that Doe is not even qualified to be a Medicaid recipient.
The only document in the record showing that Doe has a present entitlement to *365 Medicaid services is a recent Administrative Order of the DHHS Hearing Officer, filed with this Court pursuant to Fed. R.App. P. 28(j), determining that Doe should continue to receive “respite” services, but not “residential habilitation” services, pending the outcome of the administrative appeal of her termination from the Medicaid MR/RD Waiver program. To me, it seems entirely appropriate that the State Medicaid agency, having found Doe to be ineligible for comprehensive “residential habilitation” services, would fund only necessary “respite” services pending the administrative law judge’s decision, since by the majority’s own definition “respite” is intended to be a temporary gap-filling measure and not a long-term solution. And since Doe is in fact being provided “respite” services at this time, she has no basis to claim that the State is failing to furnish the services for which she is eligible with the required degree of promptness.
In sum, because Doe cannot, as of today, make a showing that she is entitled to residential habilitations services in the first place, there can be no live controversy surrounding the derivative issue of whether those services have been furnished in a reasonably prompt manner. Moreover, even if we assume that Doe ultimately will prevail in her administrative appeal and that her eligibility for “residential habilitation” services will be reinstated, I have no reason to believe that DDSN would at that point defy the order of a state administrative law judge and refuse to place Doe promptly in an appropriate facility that provides those services. Thus, this is no longer (if it ever was) a ease that is capable of repetition yet evading review. Therefore, even if I agreed with the majority that Doe’s “reasonable promptness” claim was not moot at the time of the district court’s judgment, I would now dismiss her appeal as moot, or at the very least remand to the district court for additional findings with respect to how these post-judgment developments at the administrative level impact her standing.
II.
Because I believe that Doe’s “reasonable promptness” claim is moot, I would not reach the thorny issue of first impression in this circuit of whether 42 U.S.C. § 1983 provides Doe with a remedy for alleged violations of 42 U.S.C. § 1396a(a)(8). Nonetheless, because the majority does reach this question in Part II.B. of the lead opinion, I feel compelled to explain why I believe the majority’s holding is legally incorrect.
With respect, I do not believe that the three-factor test of Blessing v. Freestone, 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997), should control our analysis in light of the Supreme Court’s more current opinion in Gonzaga Univ. v. Doe, 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002), which was explicitly intended to resolve considerable uncertainty stemming from the Court’s prior opinions on the subject.[5] In the Gonzaga opinion, the Supreme Court reemphasized a fundamental principle that had become obscured in cases like Blessing: Nothing “short of an unambiguously conferred right” will “support a cause of action brought under § 1983.” Id. at 283, 122 S.Ct. 2268. The Court then went on to hold that the judicial function is exclusively one of determining what “Congress intended” by enactment of the statute — a task which, like other matters of statutory interpretation, is to be resolved in the first instance by *366 looking to the “text and structure” of the relevant statute. Id. at 285-86, 122 S.Ct. 2268.
In finding an absence of congressional intent to create a privately enforceable right under FERPA, the Gonzaga Court considered as relevant three specific features of the statute: It “contain[ed] no rights-creating language;” it had an “aggregate, not individual, focus;” and it “serve[ed] primarily to direct the Secretary of Education’s distribution of public funds.” Id. at 290, 122 S.Ct. 2268. Additionally, the Court considered whether Congress “chose to provide” an alternative “mechanism” to private litigation “for enforcing those provisions.” Id. at 289, 122 S.Ct. 2268. Importantly, the Court considered the availability of administrative review to be directly relevant to the issue of congressional intent not to create a privately enforceable right, independent of the secondary issue of whether those procedures are so incompatible with private enforcement as to displace a remedy under § 1983. Id. at 290 & n. 8, 122 S.Ct. 2268.
Like FERPA, the Medicaid statute was enacted pursuant to the congressional spending power, and its primary purpose is to direct the appropriate executive branch officer (in this case, the Secretary of Health and Human Services) in the distribution of appropriated funds to accomplish the stated purpose. The Act’s preamble speaks directly to these purposes, providing in relevant part as follows:
For the purpose of enabling each State ... to furnish (1) medical assistance ... and (2) rehabilitation and other services ..., there is hereby authorized to be appropriated for each fiscal year a sum sufficient to carry out the purposes of this subchapter. The sums made available under this section shall be used for making payments to States which have submitted, and had approved by the Secretary, State plans for medical assistance.
42 U.S.C. § 1396. Due to the nature of spending power enactments as such, we begin our analysis with a presumption that Congress has not intended to create a private remedy. See Pennhurst State School & Hospital v. Halderman, 451 U.S. 1, 28, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) (“In legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State.”); accord 42 U.S.C. § 1396c (providing that the remedy for State noncompliance with any provision of section 1396a is the withholding of federal funds).
The very next section of the act, codified at 42 U.S.C. § 1396a, sets forth several criteria that a “State plan for medical assistance” must satisfy in order to gain federal approval and enable the Secretary to disburse federal funds. Among these requirements is the provision upon which Doe purports to base her “reasonable promptness” claim:
A State plan for medical assistance must—
(8) provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals....
42 U.S.C. § 1396a(a)(8). However, this provision lacks the kind of “rights-creating language” that Gonzaga requires as a basis for private enforcement, and it has an “aggregate, not individual, focus.” Specifically, the statute speaks only to what the state plan must generally “provide” for in order for the state’s Medicaid program to *367 qualify for federal funding. Thus, like FERPA, section 1396a(a) is written “in terms of institutional policy and practice,” and does not specifically address “individual instances” of noncompliance. Gonzaga, 536 U.S. at 288, 122 S.Ct. 2268. Indeed, with respect to the daily administration of state Medicaid plans, Congress chose to require only that states “comply substantially” with the requirements of section 1396a in order to remain eligible to receive federal funding. See 42 U.S.C. § 1396c. Similarly, the Gonzaga Court singled out FERPA’s “comply substantially” provision as evidence that Congress did not intend to confer a privately enforceable right. Gonzaga, 536 U.S. at 288, 122 S.Ct. 2268.
At best it can be said, as the majority holds in its Blessing analysis, that Doe falls within the class of persons that section 1396a(a) is intended to benefit. I do not contend otherwise, and certainly do not mean to imply that Congress would require the states to craft their Medicaid plans to protect certain individual interests without regard to whether these provisions are actually followed in practice. However, it is simply not sufficient that Doe “falls within the zone of interest that the statute is intended to protect,” because it is “only violations of rights, not laws, which give rise to § 1983 actions.” Gonzaga, 536 U.S. at 283, 122 S.Ct. 2268 (emphasis in original). And nothing in the text or structure of the statute indicates that Congress intended to create judicially vindicable individual rights under section 1396a(a). Rather, the Medicaid statute in essence defines the parameters of a voluntary, pseudo-contractual relationship between the Federal government on the one hand and the states on the other. Cf. Pennhurst State School, 451 U.S. at 17, 101 S.Ct. 1531. The statute is directed in the first instance to the Secretary of Health and Human Services, setting forth the conditions upon which federal money under his stewardship is to be released in furtherance of an important public policy. The statute also addresses the states, albeit indirectly, insofar as it imposes on them certain conditions which attach to the receipt of federal money (though it does not categorically mandate state compliance insofar as states remain free to reject federal funding). But individual Medicaid recipients like Doe are at best third-party beneficiaries to this arrangement, and as such are essentially “stranger[s]” to the underlying bargain. Blessing, 520 U.S. at 349, 117 S.Ct. 1353 (Scalia, J., concurring). Indeed, nowhere is the statute directly concerned with “whether the needs of any particular person have been satisfied,” id. at 343, 117 S.Ct. 1353, and in fact those types of individual determinations are specifically left to the states as the designated administrators of Medicaid, see 42 U.S.C. § 1396a(a)(5). Because the whole focus of the Medicaid statute is on the “regulated [entity] rather than the individuals protected,” I must conclude that there is “no implication of an intent to confer rights on a particular class of persons.” Alexander v. Sandoval, 532 U.S. 275, 289, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (internal quotation marks and citation omitted).
Any lingering doubt that Congress might have intended to create a new battery of individual rights enforceable by section 1983 is in my mind dispelled by the fact that Congress has made other provision for redressing individual deprivations under section 1396a(a). Aside from the threat of loss of federal funding if the state’s practices do not meet the substantial compliance threshold, Congress has sought to ensure the protection of individual recipients’ interests by requiring that each state plan for medical assistance provide for an “opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness.” 42 U.S.C. *368 § 1396a(a)(3). Thus, Congress specifically contemplated circumstances where a Medicaid recipient has been denied the benefit of reasonably prompt agency action, and specifically provided that recourse should be available in the form of a fair hearing before the agency. Where Congress has seen fit to establish an administrative mechanism to deal with individual grievances arising in the daily administration of a program as massive and complex as Medicaid, it seems to me a reasonable presumption that Congress would have deemed the administrative remedy both appropriate and adequate to address the problem.[6] Thus, any inference that Congress might have intended to create individual rights which are judicially actionable under 42 U.S.C. § 1983 seems weak indeed. Gonzaga, 536 U.S. at 289-90, 122 S.Ct. 2268.
If Congress had intended to subject the countless Medicaid decisions made by state agencies each day to the scrutiny of the federal judiciary, I would expect to find clear and unmistakable language in the statute stating as much. In the absence of such language, I cannot be so cavalier as the majority in imputing to Congress an intent to allow dissatisfied Medicaid recipients to have their routine grievances aired in federal court under the auspices of 42 U.S.C. § 1983, and instead would exercise the cautious skepticism toward the recognition of new “rights” by implication which the Supreme Court adopted in the now-controlling Gonzaga opinion. Because I cannot meaningfully distinguish between the provisions of the Medicaid Act relevant to Doe’s claims and the analogous features of FERPA with respect to which the Gon-zaga Court found no privately actionable rights, I would hold, on the authority of Gonzaga alone, that 42 U.S.C. § 1983 does not provide Doe with a remedy for the State’s alleged violations of section 1396a(a)(8)’s “reasonable promptness” standard.
For these reasons, I respectfully dissent from Part II of the majority opinion and concur only in the judgment as to Part III.

. If, as the majority holds in Part III.B. of the lead opinion, DDSN is vested by law with the right to "select[] the appropriate setting for the provision of waiver services,” then it was not a violation of either 42 U.S.C. §§ 1396a(a)(8) or (23) for the State to provide in-home residential habilitation as opposed to out-of-home residential habilitation, and Doe’s lawsuit was meritless even at its inception.

. Ironically, Doe has not been removed from a CTH II facility to-date, and so the "respite” services that the majority worries are so ephemeral in nature have been continuously provided by the State for more than three years, with all indications being that the State will continue to provide them until all legal proceedings (both here and at the State level) have been concluded. Today’s holding proves the adage that "no good deed goes unpunished” by using the State's indulgence in allowing Doe to stay in the setting of her choice pending resolution of her legal challenges to provide support for the conclusion that the State’s alleged failure to provide Medicaid services with reasonable promptness is ongoing. This dangerous precedent now encourages states to do the worst possible thing: *363 deny the provision of Medicaid services to those whose eligibility is in question pending exhaustion of administrative appeals and final resolution of judicial review.

. The parties' briefs focus on whether these state administrative decisions should be given preclusive effect pursuant to Univ. of Tennessee v. Elliott, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986). This line of argument misses the point. The state administrative actions are not collateral estoppel in the present case not only because there has not yet been a final judgment (on account of Doe's appeal to the State Administrative Law Court), but more importantly because there is no identity of issues: the issue before the State administrative decisionmakers is whether Doe is eligible for Medicaid ICF/MR services at all, while the issue before us is whether Doe has been furnished with reasonable promptness the services for which she has been deemed eligible. Nonetheless, the State administrative decisions must be factored into our standing analysis, because maintaining a legally cognizable interest in the outcome of this lawsuit presupposes that Doe's eligibility has not changed in a way that would render the relief sought nugatory.

. Any prayer for retroactive, compensatory relief would be barred by the Eleventh Amendment. See Lynn v. West, 134 F.3d 582, 587 (4th Cir.1998).

. Id. at 278, 122 S.Ct. 2268 ("[0]ur [prior] opinions in this area [have not been] models of clarity. We therefore granted certiorari ... to ... resolve any ambiguity in our own opinions.”); see also id. at 282-83, 122 S.Ct. 2268 (limiting the import of the Blessing test).

. Of course, if a state failed to provide a Medicaid recipient with adequate pre-depri-vation due process in the form of a fair hearing, then a 42 U.S.C. § 1983 action could be brought against the state, because the Fourteenth Amendment would supply the right in these circumstances. Cf. Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).